Edward "Coach" Weinhaus, Esq.
11500 Olive Blvd Suite 133
Creve Coeur, MO. 63141
314-580-9580
eaweinhaus@gmail.com
Plaintiff In *Pro Per*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD "COACH" WEINHAUS, )<br><br>Plaintiff, )<br><br>vs. )<br><br>THE REGENTS OF THE UNIVERSITY )<br>OF CALIFORNIA )<br><br>Defendant )| Case No.: _____<br><br>COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF<br><br><br><br>**DEMAND FOR JURY TRIAL** |

### INTRODUCTION

1)    Plaintiff Edward "Coach" Weinhaus ("Plaintiff") brings this action against Defendant, The Regents of the University of California ("Defendant") fordiscrimination based on federal and state law, breach of contract, tort, and unjust enrichment.

2)    Plaintiff's departure from UCLA, the nation's **top**-rated public learning institution,  as its **top**-rated entrepreneurship faculty led to a student march on the business school's dean's office led by the incoming Student Body President after their and Plaintiff's reliance on Defendant's promises which they opted to breach.

3)    Defendant's actions relied primarily on one student's complaints about Plaintiff's religion and national origin, necessitating this action.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## JURISDICTION AND VENUE

4)   This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, as this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

5)   This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy.

6)   Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices were committed within this judicial district, and Defendant conducts business in this district.

## PARTIES

7)   Plaintiff is an individual residing in St. Louis, Missouri where he is a citizen.

8)   Defendant The Regents of the University of California is a public corporation and is the governing board of the University of California system, conducting substantial business activities in the State of California, including within this judicial district where Plaintiff was employed by Defendant's schools UCLA Anderson School of Management and UCLA School of Arts and Sciences (undergraduate).

9)   "Regents," "UCLA," "UCLA Anderson," or "Anderson" hereafter shall stand for Defendant herein.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10)   On December 14, 2023, Plaintiff timely filed a charge of discrimination with the California Department of Fair Employment and Housing ("DFEH") alleging discrimination based on religion and national origin.

11)   The DFEH issued a Right-to-Sue Notice to Plaintiff dated July 23, 2024. A copy of the Right-to-Sue Notice is attached as Exhibit A.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

12)     Plaintiff's charge was dual-filed with the Equal Employment Opportunity Commission ("EEOC").

13)     The EEOC issued a Notice of Right to Sue dated October 15, 2024. A copy of the EEOC Notice is attached as Exhibit B.

14)     Plaintiff has exhausted all administrative remedies and has satisfied all conditions precedent to the commencement of this action.

**BACKGROUND DISCRIMINATION FACTUAL ALLEGATIONS**

15)     Plaintiff was employed by Defendant as a "faculty" lecturer under Non-Senate Faculty (NSF) Unit 18 collective bargaining agreement ("CBA") from August 1, 2016 until December 31, 2022, performing duties in an exceptional manner based upon reviews written by his supervisors, UCLA administrators, and students. He served 18 faculty quarters and multiple 'uncounted' summer quarters.

16)     Nothing in the CBA or any written contract prevented Plaintiff from entering into contracts with Defendant outside of the CBA for time-periods covered by a CBA-controlled appointment, nor for time-periods outside of a CBA-controlled appointment.

17)     According to UCLA Anderson's faculty review database, through his employment as a Faculty Lecturer, Plaintiff led the rankings of Entrepreneurship faculty at UCLA. See Exhibit C.

18)     As of January 1, 2023, Plaintiff was purportedly "re-employed" by Defendant as a putative Continuing Faculty Lecturer although not pursuant to any valid CBA. He worked in this capacity until even after his termination on February 28, 2023 through to April 3, 2023 as described hereafter.

19)     Plaintiff is Jewish, which is both a religious affiliation and, in this context, is his national origin.

20)     In the fall of 2022, Defendant had formed a verbal contract with Plaintiff to teach on an ongoing basis whether in an adjunct or CBA-controlled capacity, including but not limited to Spring 2023 quarter, and the following academic year which began in

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

January 2023 ("JANUARY 2023 CONTRACT", whose terms will be further described below).

21)    On or about February 22, 2023, Plaintiff received the first notice of adverse employment action. The Chairman of the Faculty of UCLA's Anderson School of Management, Sanjay Sood called Plaintiff and informed him that he would not be *allowed* to teach after the Winter Quarter which terminated on April 3, 2023 and thus would not be allowed to teach in the Spring 2023 Quarter and going forward as determined in the JANUARY 2023 CONTRACT.

22)    Defendant then wrongfully shut off Plaintiff's benefits and access to teaching technology such as Zoom and access to the student learning portal in March 2023, while demanding he continue to work for the Defendant through March 2023 and into April 2023. Susan Murray as an administrator for Defendant confirmed this information on a phone call on March 7, 2023. The Defendant sent further communications notifying Plaintiff he was a former employee. See Exhibit D.

23)    Defendant's negative employment actions were primarily based on soliciting, accepting, highlighting, and over-emphasizing one negative student review in a faculty review process. The review was full of factual errors and demonstrated the student was upset about being "Bait and Switched" (*infra*) by the Defendant when it changed a key course, using Plaintiff's key skills to negotiate the shift ("FALSE REVIEW").  The student review spent three sentences in content on Plaintiff. Two sentences were inaccurate about Plaintiff directed at his Jewish background and the third called the course "entertaining" even though still upset about the "Bait and Switch."

24)    The two negative comments related to Plaintiff's Jewish background were:
   a. "referred to himself frequently as 'the hardest drinking Jew in Chicago' and
   b. "He also taught every lesson about integrity or morality through Old Testament examples."

25)    The Defendant's defined curriculum required mention of Old Testament as well as Jain, Christian, and other faith morality for the coursework. Plaintiff has not

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

resided in Chicago for more than a decade. Nonetheless, the student, although entertained after the Defendant's "Bait and Switch" took his/her wrath out on Plaintiff. Defendant.

26)    In fact, the only review the Defendant solicited of its own accord was the FALSE REVIEW.

27)    Upon information and belief, the FALSE REVIEW was improperly solicited as being: during the barred time-period of COVID restrictions and from the Bait and Switch period of January 2020 through June 2021.

28)    Defendant, through its agents and employees, engaged in a pattern and practice of discrimination against Plaintiff based on his Jewish religion and national origin, including but not limited to:

a. Subjecting Plaintiff to derogatory comments about his Jewish background and religious texts during his CBA-mandated promotion review to continuing employment in 2022 and 2023 by soliciting, accepting, highlighting, and over-emphasizing the FALSE REVIEW;

b. Denying Plaintiff opportunities for advancement that were only denied him based on these unreasonable criticisms in the first subparagraph none of which have been analogously applied to similarly situated non-Jewish employees (whether about their background, their faith, or as it relates to classic western foundational ideas based on Jewish texts); and

c. Imposing the harshest of disciplinary actions against Plaintiff compared to non-Jewish colleagues for similar or lesser student complaints by terminating his employment on the basis of the comments in the first subparagraph while still demanding he teach for Defendant *after* they terminated his employment, ended his benefits, and denied him access to teaching technology, and then breaching the other contracts with Plaintiff as described herein.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

29)    On multiple occasions, Plaintiff reported the discriminatory treatment to the Defendant's relevant Faculty Committee or its leadership, but Defendant failed to take appropriate corrective action.

30)    As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, loss of income, and other damages.

**PLAINTIFF'S ACADEMIC, PROFESSIONAL, & TEACHING BACKGROUND**

31)    Plaintiff earned a First-Class Degree with Honours from the London School of Economics in 1994 (BSc. Economics) and an MBA in Finance and Entrepreneurship from the University of Chicago's Booth School of Business ("Booth") in 2001 where he studied simultaneously with Nobel Price Winners Eugene Fama and Richart Thaler.

32)    He garnered significant success in his professional capacity working for large banks and energy companies before becoming an entrepreneur where he built and exited multiple businesses before 2015.

33)    In 2015, he founded what would become a public company, Athena Bitcoin Global (Ticker: ABIT), *BlockTribune* (which would become the hallmark publication of Judiocracy LLC, exited 2024), entered Washington University School of Law as a 1L, and began his official teaching career at Washington University's Olin Business School.

34)    In 2016, Plaintiff joined UCLA's faculty under the auspices of the NSF 18 CBA terms in 2016.

35)    Plaintiff taught one quarter at UCLA Anderson to graduate MBA students before agreeing to focus his teaching on core courses in UCLA's Arts and Sciences competitive Undergraduate Minor in Entrepreneurship ("UME") under the auspices of UCLA Anderson's Price Center.

36)    Also in 2017, Plaintiff taught at Pepperdine University's Graziadio School of Management with the Price Center's permission so he could develop further curricula for UCLA courses.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

37) At all times while in the employ of UCLA prior to earning his *Juris Doctor* in 2018, Plaintiff was enrolled as a full-time law school student in St. Louis (and while traveling to oversee the expansion of ABIT which was located in Chicago). Concurrently, he graduated *cum laude* from the University of Nicosia's Masters in Digital Currency program before enrolling in Washington University's LLM in Negotiation in Dispute Resolution (2019), and its *Juris Science Doctorae* program (dissertation submitted).

38) In 2019, Booth hired Plaintiff as an Assistant Professor in Entrepreneurship (Adjunct) to teach its first class in Cryptocurrency and Blockchain, again with the permission of UCLA via Dr. Al Osborne, the then-head of the Price Center.

39) After finishing his employment with Booth, Plaintiff became a licensed attorney in three states (California, Missouri, and Illinois), successfully passing the California bar exam and the Uniform Bar Exam in 2019.

40) In 2021, Plaintiff served as President of ABIT when he helped it implement bitcoin-as-legal-tender for El Salvador, the first nation to do so. During this time, he conducted his courses at UCLA while back-and-forth between Latin America and California.

41) In 2022, Plaintiff was feted by Slate.com as heading one of the 10 best podcast episodes based on litigation he filed and settled with a group of legal podcasters required by court order to correct the record on-air.

42) Plaintiff now runs LegalSolved LLC a multi-state, multi-practice law firm.

43) Plaintiff is also the CEO and Publisher of Judiciocracy LLC – the nation's largest publisher of Judicial Misconduct and Attorney Misconduct news – which he sold in 2024 to a group of Chicago-based investors.

44) Since the wrongful termination at UCLA, Plaintiff has continued building his law practice, including becoming lead counsel for one of the nation's largest Freedom of Information Act non-profits, influencing the Georgia election rules ahead of the 2024 campaign, submitted his doctoral dissertation related to Cryptocurrency and

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Monetary Sovereignty, has taught both men's and women's strategy and law classes at Yeshiva University, served as a War Correspondent in Israel (breaking the "Dad, I killed 10 Jews" story[1] before the audio was released), started a humanitarian relief effort for Gazan non-combatants (GazaPassage.org), and is recognized as America's "most aggressive judicial reformer." Although published in the *Wall Street Journal* (twice), *American Greatness*, the *St. Louis Jewish Light* as a Jewish issues commentator in 2023, he also won a finding for a class discrimination against a class of Muslims by the EEOC as a civil rights litigator in the same year (and earned judgment before the Hon. Lashonda Hunt N.D. Ill. 1:24-cv-01757 IRMO *Farah).*

45)    In short, Plaintiff's unmatched teaching record was accompanied by a contemporaneous record of accomplishment in academic, business, civil rights, financial markets, government transparency, the legal profession, and world affairs.

46)    During this same period, he became the full-time primary residential custodial parent of several children by agreement.

**PLAINTIFF'S HISTORY AT UCLA PRIOR TO PERFORMANCE REVIEW**

47)    When Plaintiff began working at UCLA in August of 2016, he was asked to acknowledge an "APPOINTMENT" pursuant to the CBA.

48)    This APPOINTMENT and all subsequent APPOINTMENTS are not a binding contract.

49)    Nothing in an APPOINTMENT or any contract related to it claims to be the complete and exclusive statement of the terms of any agreement.

50)    The parties through their actions intended to have agreements outside of the terms and topics of the APPOINTMENT.

---

[1] https://globebanner.com/stories/650438227-dad-i-killed-10-jews-10-10-10-see-my-whatsapp-their-blood-is-on-my-hands-let-me-talk-to-mom-israeli-admiral-details-horror-of-massacre-body-cam-videos - Plaintiff's message sharing the story with the IDF prompted their release of the audio which has then become a staple of understanding the October 7th under a Western prism.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

51)    The APPOINTMENT contains some of the following indicative terms:

   a.   UCLA had an option to Plaintiff's time and no obligation to pay him for that option when UCLA desired Plaintiff teach a course in any given quarter;

   b.   UCLA would list which course it *may* desire Plaintiff teach;

   c.   UCLA could cancel any of its purported obligations to Plaintiff at any time, (even after Plaintiff's work for a course began) and then not have to pay the promised money so long as it also terminated the course;

   d.   UCLA would list the courses covered by that particular "APPOINTMENT" and no other courses were covered unless listed, which did not prevent coursework to be assigned outside of a CBA-covered appointment..

   e.   The limited, one-sided purported APPOINTMENT indicative terms would often be overridden, modified, or added to by verbal adjustments from Defendant upon which Plaintiff often reasonably relied;

   f.   In some circumstances, Defendant was subject to an APPOINTMENT, then told he was overpaid because Defendant unilaterally reduced the classwork available for Plaintiff to teach;

   g.   In some circumstances, Plaintiff was subject to a verbal agreement to teach in one quarter, did so, and then Defendant only paid in future academic years in Defendant's own complete ignoring of its own process for APPOINTMENT;

   h.   Included no term by which the APPOINTMENTS were deemed the exclusive arrangements between the parties.

52)    When first hiring Plaintiff, UCLA informed him that it intended faculty such as Plaintiff to work elsewhere at the same time, so that the job was *not* intended to be full-time. Later, UCLA APPOINTED Plaintiff to full-time (above 50%) teaching schedules.

53)    Plaintiff's first two classes at UCLA (one each of the first two quarters, which works on the quarter system) were uneventful. Plaintiff and the student

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

experience suffered partially from inconvenient scheduling around Plaintiff's law school schedule.  His first class in the Fall of 2016 was for full-time MBA students on Thursday evening – the same night the MBA students drank and ate at a weekly social event outside the classroom. His next class was at 8 am on Monday mornings for undergrads – not exactly "prime teaching time."

54)    Plaintiff's student reviews for these two outings were unexceptional until he learning that his own academic obligations affected student schedules and therefore their reviews.

55)    By Summer of 2017, with the above scheduling snafus worked out, Plaintiff hit his stride at UCLA, particularly relying on his (free) proprietary instructional frameworks which he posts on CoachForged.com.

56)    Plaintiff implemented an inverted classroom pedagogy. His unique coursework included:

    a.  The Iron Laws of Entrepreneurship (Eight Videos)

    b.  The OUTSIDE-IMPACTS Analysis of a startup (cribbing Professor Steve Kaplan at Booth) (15 videos)

    c.  Coach's Own Framework pitching a business plan including his proprietary "Three Prongs Of the Open", PSP, and QCOAT'ing methodologies (16 videos)

    d.  Entrepreneurial Marketing (6 videos).

57)    Plaintiff began earning consistently excellent student reviews thereafter. (See Exh. C).

58)    Pursuant to the CBA, Plaintiff would receive a mid-period review after teaching nine quarters. Plaintiff 's mid-period review was conducted by Professor Emeritus Lippman who reviewed Plaintiff's student reviews up through that time. Lippman told Plaintiff that "you will be promoted to Continuing Lecturer easily with these types of reviews."

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

59)    Professor Lippman saw and received no reviews that mentioned Plaintiff's Jewish heritage or religious faith, as the reviews that did so only came after this mid-term review.

60)    UCLA Anderson's Price Center, on behalf of Defendant under multiple different executives, increasingly leveraged Plaintiff's flexibility and pedagogical talents. UCLA eventually hired Plaintiff more so than any other non-tenured or non-managerial faculty teaching comparable courses.

61)    Plaintiff's demonstrable love for teaching, building educational content, learning frameworks, and particularly UCLA students allowed Defendant an opportunity to take advantage of his reliance on its promises.

62)    UCLA employed Dr. Al Osborne as the head of the Price Center for UCLA Anderson (and then Interim Dean of Anderson) who took advantage of Plaintiff's business acumen and enthusiasm when UCLA Anderson found itself in a budget *pickle*.

   a.  UME's independent study classes (which are *experiential* in nature) were then <u>not</u> classroom-based but a core course to the competitive program. UCLA thus only allowed a maximum of seven students per faculty member. But due to the number of students in the pgroam, it meant that these students would create up to 15+ teaching courses (and faculty salaries) for a graduating class of 100 UME students (typically taking courses MGMT 195/199). That, Defendant found, was far too expensive.

   b.  UCLA had earlier asked Plaintiff to teach a full-time load of sections or teach a class of these students over the summer to handle the large number of sections required by the seven student per class requirement. The payment for these courses proved harmful to the UCLA Anderson budget.

   c.  Thus, in 2018, Dr. Osborne slotted Plaintiff to help build a unique hybrid replacement curriculum with both a *classroom*-based component along with the prior experiential version of the class for the purposes of including more

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

students per faculty course, thereby reducing the faculty expense for providing education services to the UME students.

63)    Dr. Osborne asked Plaintiff to create a first draft of a syllabus for the new hybrid version of experiential learning with a classroom component and promised Plaintiff he would be able to teach the classroom-enabled-hybrid-version of the experiential class (MGMT 169) going forward when the class ultimately became approved should Dr. Osborne find his teaching skills satisfactory upon personal observation. Defendant promised Plaintiff he could continue to teach the course so long as it was offered regardless of any CBA-controlled APPOINTMENT, such as through an adjunct position.

64)    Plaintiff agreed to Defendant's terms and thus they formed a verbal contract with UCLA Anderson in 2018 ("MGMT 169 VERBAL CONTRACT").

65)    Had Plaintiff been told he would not be allowed to teach the course outside of a CBA APPOINTMENT he would not have agreed to the MGMT 169 VERBAL CONTRACT.

66)    Dr. Osborne and Plaintiff co-lectured to give Dr. Osborne an opportunity to assess Plaintiff's classroom teaching skills.

67)    Dr. Osborne co-taught with Plaintiff twice and performed two peer reviews of Plaintiff's teaching ("FIRST TEACHING PEER REVIEWS").

68)    Plaintiff fully performed his obligations including planning to teach with Dr. Osborne, co-teaching with Dr. Osborne, passing Dr. Osborne's peer review, and building an initial syllabus.

69)    Plaintiff's performance of the MGMT 169 VERBAL CONTRACT was based on Plaintiff's reliance on assurances that he could continue teaching at UCLA even absent an NSF 18 CBA or union-based APPOINTMENT, such as through an adjunct position.

70)    At no point did Dr. Osborne, who served as Dean from 2018 through July 2019, ever inform Plaintiff that there were any *conditions* to this promise. Dr. Osborne

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

had access to student reviews, direct observation of Plaintiff's classroom skills, and determined that Plaintiff was the best faculty possible to teach the class – a prescient move it would turn out.

71)    Plaintiff continued to perform even as Defendant then increased Plaintiff's obligations. Whereas other faculty were not required to teach sections of MGMT 195/199 (independent study), Plaintiff was required to teach the same course with a classroom component in preparation for MGMT 169 in Fall Quarter 2019.

72)    Fall 2019 Quarter was the final offering of MGMT 195 before MGMT 169 went live the next quarter. Plaintiff had three classroom sessions for each of multiple MGMT 195 sections not required of other faculty who taught the same course. Plaintiff only agreed to perform this extra requirement, which was not part of any APPOINTMENT, based on the Defendant's promises to perform MGMT 169 VERBAL CONTRACT.

73)    The Director of the UME program ("DIRECTOR") came to observe Plaintiff teaching this coursework in person for MGMT 195 in the Fall of 2019. ("SECOND TEACHING PEER REVIEWS"). DIRECTOR approved of Plaintiff's teaching skills and additionally relied on the MGMT 169 VERBAL CONTRACT in planning for the UME Program.

74)    The students loved the course too, giving Defendant further confidence in its money-saving move to transition to the hybrid MGMT 169 course with a larger classroom and future faculty sessions than the existing MGMT 195. The student reviews for Plaintiff's Fall 2019 session were particularly excellent. See EXHIBIT E.

75)    The new hybrid course - MGMT 169 - would lower the formerly-required "faculty salary classes" to be cut 80% (down to three sections from 15 sections annually) thanks to Plaintiff's engagement and performance of the MGMT 169 VERBAL CONTRACT.

76)    Further, because each instructor now had to handle 5x the amount of experiential work per class and the *students still maintained their 80 hours of work*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

*outside of the classroom*, Dr. Osborne insisted that the rigor of the *homework* not ALSO include 80 hours of work outside the classroom. That is, the experiential work took place of some (not all) of traditional homework.

77)    Dr. Osborne, and his successors, also expected everyone in the class to receive an A grade and put this policy in writing. (In fact, Plaintiff modified this by giving several A+s and A-s to ensure students had some *skin in the game*, even if slightly more rigorous than laid out by Dr. Osborne.)

78)    The MGMT 169 course was approved by Defendant to teach for Winter (January) 2020 Quarter on or about November 14, 2019.

79)    As such, the Defendant earned the full benefit of Plaintiff's MGMT 169 VERBAL CONTRACT performance by reducing the cost of teaching the UME Core Experiential Course by 80% to the savings of approximately $250,000 per year. Absent Plaintiff's performance, Defendant would not have been able to reduce the spending on faculty.

80)    Thus, by January 2020, Plaintiff was the sole faculty member at UCLA who could teach - and did teach - all three core courses of the UME (MGMT 160, 161, 169). Not even DIRECTOR (who served under Defendant) then had that experience.

81)    None of the other UME faculty achieved Plaintiff's high rankings.

82)    His enthusiasm and skillset would be needed to maintain student satisfaction. The new 10-week classroom experience was a huge inconvenience to the students in the UME starting in the Winter 2020 – had they only taken 195 or 199 a quarter earlier they could have avoided the extra work involved.

83)    They signed up for the UME when the in-person requirement with a 10-week course didn't exist. This tactic of changing the students' obligation is referred herein as the "Bait and Switch."

84)    The students were upset about the new requirements. They would blame the instructor – Plaintiff - for the new obligations his syllabus required of them (in lieu of the Defendant which used Plaintiff to engineer the scheme to save money).

14

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

85)     For tempering the student concerns, Defendant needed an instructor who would bear the student displeasure while teaching a new course which is why Dr. Osborne and DIRECTOR double-checked Plaintiff's teaching through the FIRST and SECOND PEER TEACHING REVIEWS. Thus, Plaintiff would "take the hit" in reviews and make the students appreciate the class as much as anyone at UCLA Anderson could, in exchange for keeping his role going forward which would put his potential PROMOTION (*infra*) at risk through a negative review (as indeed Defendant's solicitation…reliance on FALSE REVIEW did).

86)     The DIRECTOR made a further request of Plaintiff – to ensure the former experiential classes – MGMT 199 (Business Creation) and MGMT 195 (Entrepreneurial Internship) were both incorporated in the new class, Plaintiff would have to teach *two classes as one* – addressing and managing some students who were creating their own businesses and others who were interns at other entrepreneurial companies. This request was a new requirement not part of the MGMT 169 VERBAL CONTRACT. As the courses (the old 195 and 199) had never been taught together before, upon information and belief, this request was also outside of any APPOINTMENT.

87)     The DIRECTOR also made clear that the workload could be adjusted to address this complexity so long as learning outcomes weren't affected.

88)     The first quarter (Winter 2020) of the new MGMT 169 class had some specific feedback upon which Plaintiff improved thereafter but even then scored a "5" median overall as the highest-possible ranking among the students.

89)     Plaintiff taught the course three more times through Winter 2021 with consistency excellent results – highest medians of "5.0" every time.

90)     The DIRECTOR observed Plaintiff teaching again in at least 2020, 2021 ("THIRD TEACHING PEER REVIEWS").

91)     The DIRECTOR consistently spoke with Plaintiff about how the class was going and emphasized that the course was not intended to be "*typical-classroom*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

rigorous" because it was so "*outside-of-classroom* rigorous" with the 80-hour experiential requirement.

92)    The DIRECTOR also required Plaintiff to approve all experiential learning prior to student entry *by student* as part of Plaintiff's ability to keep teaching the MGMT 169 course. That means Plaintiff had to examine outside companies if they were "entrepreneurial" enough and examine whether their own business ventures were viable. If not, it was Plaintiff's responsibility to manage the consequences through team formation In some cases, Plaintiff found students an internship through companies where he had relationships such as being a board director. These tasks represented a new requirement not part of the MGMT 169 VERBAL CONTRACT or any CBA-controlled APPOINTMENT. Plaintiff accepted the new obligations and performed these administrative tasks without compensation as a part of his attempts to continue to ensure Defendant's honored its obligations.

93)    For the Spring 2021 Quarter, Defendant demanded that the class size be nearly doubled again, well above the prior classroom limit of 35 to 60 to ensure there was only *one* class in the Spring rather than the two required in a budget-saving, student learning outcome-harming move.

94)    Defendant confirmed the original ethos of the "hybrid course" restating again: "You are welcome to alter assignments as you see fit to adjust for the class size of 60 students as long as they yield the same learning and assessment." That is, the classroom work could be lowered to address the complexity of teaching.

95)    Plaintiff fought this move and succeeded by asking the Defendant to rely on experiential learning Dean Jeff Scheinrock's assessment. Dean Scheinrock agreed with Plaintiff.  Keeping the classroom to individualized experiences for each student as part of a classroom community was integral to the excellent learning outcomes which led to Plaintiff's unmatched "5.0" median reviews.

96)    Plaintiff so successfully protected the Defendant from the student dissatisfaction hit for changing UME requirements mid-program that the course gained

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the attention of the DIRECTOR more than a year later, who himself sought to teach the class, once the *coast was clear* from the dissatisfaction from the first four quarterly cohorts. DIRECTOR began teaching the course only after the Bait and Switch cohorts had mostly finished the program..

97)     This renewed interest in the class from other faculty due to Plaintiff's excellent reviews ironically served to punish Plaintiff. The Defendant violated its obligations in the MGMT 169 VERBAL CONTRACT to allow Plaintiff to continue *exclusively* teaching the course by allowing DIRECTOR to teach the same course at the same time in Spring 2021. In violation of the contract, Defendant gave DIRECTOR all the other sections of the course promised to Plaintiff but for one section per year.

98)     Defendant thus modified the MGMT 169 VERBAL CONTRACT by promising Plaintiff he could teach one section per year of MGMT 169 and to otherwise make-up missing classes with enough classes for Plaintiff to teach at least 4 classes per year (out of a full-load of 9) ("MGMT 169 UNILATERAL MODIFICATION"). At no time did Defendant ever modify the promise to ensure Plaintiff would continue teaching with or without CBA-controlled APPOINTMENT.

**PLAINTIFF ACCOMPLISHMENTS TEACHING IN THE UME**

99)     The Spring 2021 Quarter matchup between Plaintiff and Director - head-to-head teaching-time matchup, randomly assigned students, same class -  allowed perfect comparisons for the excellence of Plaintiff's instructional work and student outcomes. The only difference was that Plaintiff and DIRECTOR agreed that Plaintiff was the more qualified faculty to teach a class which contained *both* Business Creation and Entrepreneurial Internship students (as opposed to only the latter). That is Plaintiff had the harder pedagogical challenge and the significantly larger class.

100)    In head-to-head rankings, Plaintiff's classroom ratings exceeded those of DIRECTOR. Further, Plaintiff's pedagogical tools had his students doing more "classroom work" voluntarily than the purported required work in the other section.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

101)   The two went head-to-head again in the Spring of 2022. Plaintiff again exceeded DIRECTOR's rankings with a more complex class, more overall work being done, by more students. This time, Plaintiff scored a 4.92 average ranking out of 5 and again a median of 5.0.

102)   Plaintiff's accomplishments with UME coursework to the benefit of the Defendant include:

    a.  He wrote and submitted two courses for approval to teach without extra compensation outside of any APPOINTMENT, including the aforementioned and a unique law class "Entrepreneurial Strategy and the Law"

    b.  His student reviews since the Summer of 2017 were a "5" – ie the highest possible – for 16 of 17 sections taught, save for one "4.5" in the elective Law class (Exh. C)..

    c.  He scored perfect "5" median rankings in teaching courses for the very first time in 5 different courses.

    d.  He scored perfect "5" average rankings multiple times in core courses;

    e.  His overall rigor average exceeded a "4.1" in all courses that didn't include the "Experiential" hybrid component and even those exceeded 3.5.

103)   Plaintiff's "distance from perfect" on all student rankings was ".35" (ie 5.00 minus 4.65) which was half the same distance from perfect than the MBA-level Entrepreneurship faculty (.76) which itself trailed overall MBA faculty (.69).

104)   Plaintiff's unparalleled student rankings in excellence among cohorts of undergrads (19-22 year olds) was remarkable for another reason. Plaintiff is one of the most intensely *provocative* faculty members generating student discussions.

    a.  In Winter 2020, he held the first ever "Pronoun Auction" where pronouns were treated as property to be bought and sold with fining authority played with real cash;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

   b.  His "Ethical Challenges" had a 100% Success Rate for demonstrating that each voluntarily participating student was an "ethical hypocrite" based on their own revealed preferences;

   c.  In the Fall of 2022, Plaintiff held an optional session for students to do an "anachronistic" analysis of "The Transatlantic Slave Trade As An Entrepreneurial Opportunity" for the purposes of understanding how the future would judge business people today for some of our actions;

   d.  Plaintiff openly discussed with students uses of the N-word historically (without ever uttering it), including the "niggardly" controversies, then-UCLA Law Professor Volokh's unapologetic use, the USC controversy over a Chinese synonym, and most relevantly, over the students' own common usage of it in modern culture.

**DISCUSSIONS & DEAN COMPLAINT FOR BEING TOO RIGOROUS**

105)  Plaintiff was not without *any* imperfections, particularly regarding the difficulty of his exams. During exams in 2022, a technical glitch created the need for rescheduling an exam. A top student complained to then-Dean Tony Bernardo's office about the enforcement of time limitations on it because otherwise, she wrote: "Making this a 'take home' exam makes it so every single issue in the 9 page brief must be addressed and addressed properly— this means writing an extremely thorough and extensive response in order to fully answer the questions."

106)  But absent the one complaint to the Dean about being too rigorous of an examiner, students generally rewarded Plaintiff not with complaints but with accolades. For example, after volunteering for the "slave trade" thought exercise, one student sent the email in EXHIBIT F. After another classroom discussion, a student wrote in his reviews: "Coach, you are one of the best, if not the best, most caring professor at UCLA. The discussions were engaging and I even got to be a Republican and defend [Kyle] Rittenhouse without being canceled. Best professor ever!"

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

107)   Plaintiff's teaching methodology turns "cancel culture" on its head – the classroom being a place for authentically exploring ideas, one's own and others, each gaining from the other. The rules on discourse were summarized for the students on Plaintiff's free teaching website. (See https://coachforged.com/mgmt-167-introduction-class-rules-on-discourse/ ). These rules and the student experiences from them constituted another benefit to the UME that Plaintiff uniquely brought.

## ADDITIONAL CONTRIBUTIONS TO UCLA

108)   Plaintiff had proven a valuable member of the UCLA Anderson community by referring in paying consulting clients to the MBA program which used the business clients for experiential project work for MBAs.

109)   A different part of the MBA experiential hired Plaintiff per an APPOINTMENT to work with students who had challenges, either interpersonal, or where Plaintiff's past business plan coaching would generate positive academic outcomes.

110)   In 2022, Defendant's demands on Plaintiff's time as promised coupled with his deadlines for his academic work at WashU (JSD) required Plaintiff step down from his role as Founder, President and Director of Athena Bitcoin Global (ABIT) in reliance on then promises made by Defendant with significant expense to Plaintiff.

## NSF 18 PERFORMANCE REVIEW PROCESS

111)   In 2022, Defendant was obligated by the NSF 18 CBA  to conclude Plaintiff's evaluation for promotion to Continuing Lecturer prior to the end of his 18th Quarter ("PROMOTION"). The review would have two *independent* parts – summarized as "Are You Good Enough" (Excellence) and "Do We Need You" (Staffing). The "Do We Need You" aspect was determinative – if a faculty member was hired for a 19th Quarter, then the answer to "Do We Need You" is "yes," without question by the terms of the CBA.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

112)  Defendant hired Plaintiff for a 19th Quarter prior to the "Are You Good Enough" review. By doing so, Defendant foreclosed any ability under the CBA to conduct any "Do We Need You" determinations.

113)  The "Are You Good Enough" evaluation is intended to be based on a reasonable review by Defendant, as advised earlier by Emeritus Professor Lippman. Assessments related to "Are You Good Enough" are only controlled by the CBA for relevant employment and does not apply exclusively to Plaintiff's relationship with Defendant in the MGMT 169 VERBAL CONTRACT and the JANUARY 2023 CONTRACT (*infra*).

114)  Plaintiff was recommended for PROMOTION 3-0 by the Defendant's *Ad Hoc* Committee (whose membership was wrongfully kept confidential). The Staffing Committee recommended Plaintiff 4-1 for PROMOTION even though that aspect of the "Do We Need You" review was already determined by the 19th Quarter APPOINTMENT.

115)  Dr. Olav Sorenson, the new head of the Defendant's Price Center, who regularly met with Plaintiff, emphatically recommended Plaintiff's PROMOTION. The DIRECTOR recommended Plaintiff for PROMOTION as well.

## DEFENDANT RELIES UPON NEGATIVE COMMENTS ABOUT JEWISH BACKGROUND

116)  But thereafter, a problem arose, purportedly in the "Are You Good Enough" review. The Faculty Review Committee revisited the FALSE REVIEW even after the Ad Hoc Committee's 3-0 vote.

117)  Plaintiff had been a strong proponent of Jewish causes prior to notification of any adverse action, including:

    a.  Activity in domestic American politics supporting a supportive American policy towards Israel (see https://coachforged.com/how-i-accidentally-

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

helped-president-obama-get-elected-and-didnt-keep-gov-blagojevich-out-of-prison/ );

b. Demanding an investigation on behalf of 200 parents of his local school district for the internationally acclaimed, "Hit a Jew Day" (see https://www.youtube.com/watch?v=l14KHxsSc58 );

c. Writing publicly how President Trump's values aligned with Jewish values in 2018, including debunking the *Charlottesville hoax* (see https://stljewishlight.org/opinion/some-trump-policies-align-with-jewish-values/ );

d. Advocating free speech for pro-Palestinian elementary school students in his hometown of St. Louis to better engage in the battle of ideas to find truth (see https://stljewishlight.org/opinion/letters-to-editor/letters-to-the-editor-of-the-st-louis-jewish-light-2/ );

e. Defending Comedian Dave Chappelle for charges of anti-Semitism after his Saturday Night Live monologue caused an internet kerfuffle (see https://stljewishlight.org/news/antisemitism/comedian-dave-chappelle-courageously-calls-out-antisemitism-and-adl-is-still-upset-about-it/ );

f. Serving as the Special Media Advisor to the Chairman of the Knesset's Constitution Law and Justice Committee related to Israel's proposed Judicial Reform which was creating international headlines and mass demonstrations (see https://poachcoach.com/judicial-reformer/ ).

118)   Plaintiff demanded the Defendant disclude any reliance on a commenter who twice-referenced Plaintiff's proud Jewish faith and national origin in a negative and false fashion as in the FALSE REVIEW.

119)   Also, Plaintiff noted that it should not be relied upon, not only for its content of being obviously prejudicial, but also for its falsity and for its open complaint about

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the Bait and Switch, which was the Defendant's issue. The COVID time period issuance was another basis for rejecting it per the Defendant's own policy.

120)   In short, Plaintiff's educational and professional accomplishments were always combined with his leadership in and prolific advocate of Jewish life. Any review that attacked him for that specific aspect of his *persona* are certainly free speech, as he himself would advocate, and none can be the basis of an *employment* decision.

121)   The Defendant refused to remove any comments related to his Jewishness as a basis for review at any step in the process.

122)   The Defendant would never rely on a review that included the N-word, or wouldn't refuse to promote a member of the Jain faith for mentioning that he were Jain.[2]

123)   But Defendant acted differently as it related to Plaintiff, relying on Plaintiff's Jewish faith and national origin to serve its other purposes – that is, to pretend that the "Do We Need You" review hadn't already been determined.

**DEFENDANT REVIEW DELAYS SPUR FURTHER BAD FAITH ACTS**

124)   Although Defendant was CBA-contractually required to conduct the review prior to the end of 2022, they failed to consider Plaintiff's PROMOTION at the October Faculty meeting.

125)   The delay was then followed by a widely-reported strike of teaching assistants which shook Defendant and made them wish to re-examine "Do We Need You" considerations in the only remaining analysis they had left - the "Are You Good Enough" review, turning it into a sham.

126)   UCLA Anderson's ranking had begun plummeting among its peer MBA schools leading massive drops in applications which was widely reported. Defendant resolved to lower the number of students it would accept to increase its ranking (by

---

[2] Plaintiff specifically points to Jainism because it is one of the 15 or so religion/ethnicities he covers in the class that led to this complaint and was approved by the committee that approved the MGMT 169 syllabus.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

having a more accomplished - if smaller - student body). This would mean fewer classes for the *tenured* faculty to teach, who were also contractually guaranteed teaching positions. That would mean fewer classes would be available for the existing faculty if they granted Plaintiff's PROMOTION.

127)    The result of both striking union members and fewer classes meant that the Defendant now wanted fewer union-based faculty, such as Plaintiff, on their staff. Thus, their delay in review transformed their analysis from "Are You Good Enough" to completely be replaced by "Do We Need You."

128)    Thus, Defendant finally conducted a faculty review in December 2022 ("FACULTY REVIEW").

129)    The FACULTY REVIEW was only allowed to be an "Are You Good Enough" review, but instead was conducted with a "Do We Need You" mindset. which Thus, Defendant began inventing reasons to suggest that Plaintiff, who was objectively 'good enough'…wasn't.

130)    Defendant's purported "Are you good enough" review was steeped in procedural as well as substantive bad faith dealing, of which an incomplete list follows:

    a.  The Defendant invented a new qualification to determine if Plaintiff passed the "Are You Good Enough" standard that included requiring a faculty Peer Review;

    b.  The Defendant 'failed' Plaintiff in the review for Defendant's own failure to provide the faculty Peer Review that they had just then invented as a requirement;

    c.  The Defendant failed to acknowledge the FIRST TEACHING PEER REVIEWS as meeting their invented requirement;

    d.  The Defendant failed to acknowledge the SECOND TEACHING PEER REVIEWS as meeting their invented requirement;

    e.  The Defendant failed to acknowledge the THIRD TEACHING PEER REVIEWS as meeting their invented requirement;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

f.  The review invented another new standard demanding that "Rigor" student reviews *match* "Excellence" student reviews;

g.  The review invented another new standard that Plaintiff's Teaching Assistants all view Plaintiff as polite;

h.  The review invented facts related to Plaintiff's Jewish faith and national origin that didn't exist to fit their desired "Are You Good Enough" conclusions to meet their "Do We Need You" goals. For example, the review found that the negative comments in the FALSE REVIEW must have made other students uncomfortable with his Jewish background as much as the complaining student but, Defendant surmised, that those students didn't leave reviews because they must have dropped the class ("UNCOMFORTABLE WITH JEWS REVIEWS"). This was an impossibility – nobody ever dropped the class as Defendant's own records show. The Defendant just made it up.

i.  The review failed to provide Plaintiff an opportunity to respond to the Staffing Committee Report which relied on the negative comment related to Jewish background, allowed the FACULTY REVIEW to rely on it, and led to the UNCOMFORTABLE WITH JEWS REVIEWS hallucination.

j.  The review failed to include an NSF 18 Faculty member after keeping the membership of its Ad Hoc Committee confidential, completely against the Defendant's own policy. See https://www.college.ucla.edu/aptoolkit/unit-18-excellence-review-process-unit-18-participation/ . The removal of any NSF 18 Faculty for the Faculty Review was, upon information and belief, intended to shield Defendant from witnesses for its liability in the instant case.

**DEFENDANT CONTRACTS WITH PLAINTIFF OUTSIDE OF THE REVIEW**

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

131)    During the review process in October 2022 (the final 18th quarter under the CBA) before the FACULTY REVIEW, the Defendant found itself in another teaching jam. Long-time Social Entrepreneurship faculty Gayle Northrop would be unable to teach her popular course in Winter (January) 2023 Quarter. Her Social Entrepreneurship sections was a UME Elective course and required no exam. A proposed backup instructor would not fit the school's needs.

132)    Defendant asked if Plaintiff change his schedule for the remainder of the school year (Winter and Spring Quarters 2023) and move his classes around to accommodate Defendant's needs to solve the missing faculty for Social Entrepreneurship.

133)    Plaintiff stated that teaching a new (to him) class was a significant amount of work not envisioned by any contractual relationship and asked if he could teach the class as Professor Northrop had, which would require minimal investment. This would save a significant amount of work because Professor Northrop's class was group-project based, without exam, and notoriously lacked the kind of rigor Plaintiff's elective courses boast.

134)    The DIRECTOR, on behalf of the Defendant, stated he expected Plaintiff would re-write the syllabus from scratch and make the course more rigorous, including a final exam.

135)    The motivation for the rigorous aspect was clear. The students for Social Entrepreneurship would be already upset by not having Professor Northrop as they would expect. They would be getting a "first-timer." Thus, the Defendant had Plaintiff, the UME's top-rated lecturer, implement his own rigorous examination model. That way, if there were a negative review of the course, at least the Defendant would pay a lower price including more rigor into the coursework in the future, the next time someone other than Professor Northrop taught it.

136)    Plaintiff agreed to invest in teaching the Social Entrepreneurship course subject to the following conditions:

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

    a.   that the previous and ongoing promises to teach MGMT 169 were upheld (MGMT 169 VERBAL CONTRACT after the UNILATERAL MODIFICATION);

    b.   that his employment including promised future courses in Spring 2023 and academic year 2023-24 and forward were upheld outside of APPOINTMENT such that Plaintiff could be an Adjunct Faculty member (at significantly increased pay) rather than receive PROMOTION;

    c.   that Plaintiff be afforded all typical benefits of an employee such as access to school technology, campus facilities, his employment benefits, and timely payment during Winter 2023 quarter and beyond so long as he agreed to teach at UCLA and provided no basis for removal for cause.

137)   Many NSF 18 Faculty move from union/CBA-covered staff to Adjunct Faculty at UCLA Anderson and Plaintiff reasonably relied on Defendant's promises for the same. Plaintiff's reliance on Defendant's promises were thus reasonable.

138)   DIRECTOR accepted Plaintiff's requirements in agreeing to the JANUARY 2023 CONTRACT in the fall of 2022, and, through UCLA Anderson, Defendant added Plaintiff to the course planning system for the "19th quarter" – Winter 2023, and courses in Spring 2023, Fall 2023, Winter 2024, and Spring 2024.

139)   Plaintiff reasonably relied on these promises and representations, and Defendant and took action to his detriment to do so, much to Defendant's gain.

    a.   He re-wrote the syllabus from scratch for Social Entrepreneurship outside any CBA-controlled APPOINTMENT. Plaintiff surveyed some of the top MBA and undergraduate entrepreneurship programs in the country to develop a curriculum including but not limited to Booth, Olin and Farmer.

    b.   He fulfilled the request to teach a class with upgraded rigor,

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

c.  He adjusted his schedule and outside work obligations at his expense and opportunity cost to ensure he could increase his courseload to 'fulltime' for the academic year 2022-23 as Defendant listed in its system, and

d.  He created novel frameworks for an otherwise stale curriculum;

e.  He hired Teaching Assistants for Spring 2023 Quarter;

f.  He completed syllabi for the Spring 2023 Quarter;

g.  He reviewed students and admitted them especially into his courses for the Spring 2023 Quarter.

140)  The Defendant  confirmed that DIRECTOR and the Price Center had the authority to contract with Plaintiff outside the CBA on a call during Winter 2023 Quarter on or about February 17, 2023.


**PERFORMANCE UNDER THE JAN. 2023 CONTRACT OUTSIDE THE CBA**

141)  Plaintiff wrote the new curriculum for the Social Entrepreneurship class in such a manner to accrue maximum value to Defendant.

a.  He instituted a rigorous syllabus including a Final Exam

b.  Developed the MIAM-B framework (see https://coachforged.com/mgmt-167-introduction-miam-b-social-venture-analytic-tool/ )

c.  Built a Social Entrepreneurship analytic website  https://Socialyzer.org

d.  Produced and published a video series for video instruction ( https://coachforged.com/#mgmt167-1 ; https://coachforged.com/#mgmt167-2 ; https://coachforged.com/#mgmt167-3 )

e.  Created Two Class Projects, one of which has become a nationwide leader in judicial reform and is still run by a former class member (https://ChildrenOfTheCourt.org )

f.  Brought in a separate guest speaker as a leader in LegalTech which led to Plaintiff being the Founding Social Venture Capitalist of the Legal Accountability Project's Judicial Clerkships Database.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

142)   Plaintiff planned his future academic career by refusing job opportunities given the promises and representations made by Defendant in the JANUARY 2023 CONTRACT.

143)   Defendant marketed the courses taught by Plaintiff, its top-rated UME faculty to students and gained from his reputation for future quarters.

144)   Plaintiff performed under the JANUARY 2023 CONTRACT . Defendant failed to perform under it.

    a. Defendant began removing Plaintiff's benefits on February 28, 2023.

    b. Plaintiff had to teach the Winter 2023 course without full access to health benefits or access to teaching technology.

    c. Defendant forced Plaintiff to sign more agreements just to finish teaching the class (none of which preclude this action on their face by Plaintiff's insistence);

    d. Defendant humiliated Plaintiff, a licensed professional, in front of his students by both demanding he teach and by telling the students he was no longer employed while at the same time removing his access to teaching tools.

### ADVERSE EMPLOYMENT ACTION NOTICE

145)   Plaintiff met with Faculty Chairman Sanjay Sood on or about January 18, 2023 to discuss the inappropriate nature of the FACULTY REVIEW which could become actionable upon Dean Bernardo's review. Chairman Sood confirmed the general basis of the Faculty Review as having been conducted inappropriately, having invented standards, and that he disagreed with its conclusion.

146)   As a result of that meeting, Chairman Sood informed Dean Tony Bernardo that he believed Plaintiff deserved the PROMOTION – that he indeed met the "Are You Good Enough" standard to counteract the effect of the FACULTY REVIEW.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

147)   On February 22, 2023, Chairman Sood informed Plaintiff by phone call that his employment would terminate in six days as a result of Dean Bernardo's decision.

148)   This date serves as the first notice of a negative employment action.

149)   Chairman Sood stated that Dean Bernardo had only made the decision that prior weekend and that there was no further information to be shared. Both statements were false, Plaintiff would learn.

150)   The Defendant had sent a letter a week prior noting that Plaintiff would not be offered the further employment required had he passed the "Are You Good Enough" review. Additionally, he would not be considered a full-time lecturer (although signed up to teach full-time) and therefore that the decision was final with Dean Bernardo.

151)   The Defendant refused to release the basis for the determination or the letter until Plaintiff stated he would exercise his rights to physically inspect his files.

152)   Dean Bernardo review refused to disavow the reliance of faculty on the discriminatory FALSE REVIEW and continued the bad faith behavior of inventing "Are You Good Enough" standards to achieve the "Do We Need You" desired outcome.  In short, Dean Bernardo's review, after being hidden from Plaintiff, was more subterfuge to cover-up the Faculty's reliance on discrimination-based content.

## DEFENDANT SHUTS DOWN EMPLOYMENT DURING CLASS CAUSING STUDENT "DON'T POACH COACH" PROTEST MARCH ON DEAN'S OFFICE

153)   After Chairman Sood's notification on February 22, 2023, Plaintiff was removed from employment at UCLA at the end of that month.

154)   But there was a problem. Plaintiff was still teaching through Winter quarter which included multiple class sessions in March 2023, proctoring a final exam, grading exams, giving grades for the class, and addressing student concerns that make the quarter to extend into April 2023.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

155)   In fact, Defendant relied on Plaintiff's services and his contractual
obligations he performed from the JANUARY 2023 CONTRACT well past February
28, 2023.

156)   The students, many of whom were registered for Plaintiff's Spring 2023
classes and working with him in preparation for it, were upset when they learned of the
Defendant's actions.

157)   Their ire was exacerbated when Defendant removed Plaintiff's access to
teaching technology in front of them which delayed class and affected their educational
outcomes negatively.

158)   As a result, a week later, the incoming President of the UCLA
Undergraduate Student Body, Naomi Hammonds, organized a march on UCLA
Anderson's Dean's Office using the chant, "Don't Poach Coach." (A video of the
classroom aspect of the march can be seen at https://DontPoachCoach.com ).  ("DON'T
POACH COACH STUDENT MOVEMENT").

159)   No other faculty member at Anderson has ever been the beneficiary of this
level of student support.

160)   Chairman Sood informed one or more of the  DON'T POACH COACH
STUDENT MOVEMENT participants that the Defendant was barred by the union from
keeping Plaintiff as an employee through the remainder of Winter Quarter and for
further assignments as promised through both the MGMT 169 VERBAL CONTRACT /
UNILATERAL MODIFICATION and the JANUARY 2023 CONTRACT.

161)   Plaintiff continued to work for Defendant although no longer employed
through April 3, 2024 when he submitted final grades.

**UNION REFUSED TO PRESS CLAIMS ABOUT NON-CONTRACTUAL WORK**

162)   The UC-AFT CBA provided for union representation in arbitration, should
the union wish to pursue it, against the University for violations of the CBA.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

163)   The union was unable to pursue Plaintiff's claims fully because Plaintiff's claims were not based on a CBA contract at all – the Defendant and Plaintiff's January 2023 Contract did not fall under any CBA.

164)   During the Union's evaluation whether to pursue its limited claims versus the full claims in this action, the Defendant employed more bad faith tactics to incentivize the union not to do so. In a final analysis, the union claimed not to be able to pursue claims because the Student Reviews weren't available to them (even though this is the Defendant's responsibility).

**DEFENDANT ACCRUED EXCESSIVE VALUE FROM PLAINTIFF OUTSIDE OF DEFENDANT'S VIEW OF A CONTRACT**

165)   Plaintiff's Winter 2023 Quarter teaching Social Entrepreneurship left a mark on the entire country, through what became the class' unique approach Judicial Reform leading to two projects which have garnered media attention and judicial officers nationwide.

166)   As one of his class projects, Plaintiff conceived of "Children of the Court" – a two-part approach to helping fix the family law system: a) advocating for only judges with parental experience (or part of the foster system) to rule on parental rights cases and b) helping adult children visit the courtroom where much of their childhood may have been decided – "Children Holding Courts Accountable."

167)   Additionally, Plaintiff allowed a visitor to speak to the class, one of the floundering founders of the Legal Accountability Project ("LAP") – a legaltech non-profit hoping to get off the ground but unable to do so for lack of funding. The sputtering leader was one of Plaintiff's WashU law classmates.. A Kirkland Ellis partner, which had invested in Plaintiff's crypto company, asked Plaintiff to help get LAP off the ground since the young woman leading it needed assistance with capital raising, startup basics, technology, governance, and judicial reform basics.

168)   In both instances, Plaintiff assigned the class to give advice to the projects.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

169)   After the Defendant terminated Plaintiff's employment, Plaintiff ensured both had funding, becoming the Founding Social Venture Capitalist of the LAP and ensuring a court enforced funding of Children of the Court – a decision the student's helped make. Both made headlines for their work in judicial reform. Children of the Court has instigated litigation courts for refusing access to public proceedings. LAP launched the Judicial Clerkships Database with Plaintiff's funds and the "LAP Pledge" which later drew the ire of the federal judiciary ethics for allowing an individual judge to promote his/her own obeisance to accountability. UCLA students in the class can now add to already-impressive CV's their distinct work in helping create two of the nation's leading judicial reform organizations based on their participation the novel and rigorous Social Entrepreneurship coursework Plaintiff instituted in the Winter of 2023.

170)   Children of the Court is still run by a former student in the class.

171)   The value of these organizations does not accrue to shareholders but rather to the public and to the credit of UCLA's UME, which is promoted as the founding location of the organizations' funding.

172)   But UCLA received that value unjustly having terminated any contract (whether APPOINTMENT whose period ended February 28, 2023 or the JANUARY 2023 CONTRACT).

**PLAINTIFF EXPERIENCED DAMAGE DUE TO DEFENDANT'S ACTIONS**

173)   As a direct result so Defendant's wrongful conduct, Plaintiff experienced DAMAGES including but not limited to:

    a. Plaintiff experienced emotional damages as a result of Defendant's actions after Plaintiff relied on Defendant's many breached promises;

    b. Plaintiff experienced emotional damages as a result of Defendant's actions discriminating against for his Jewish background;

    c. A delay, still ongoing, to earning his doctoral research degree as a result of Defendant breaching its contracts and causing emotional distress;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

    d.  Lost income and benefits as a result of breach of contract as a result of
Defendant breaching its contracts and causing emotional distress

174)  Plaintiff experienced further humiliation and reputational damage from the Defendant's actions requiring Plaintiff to teach in front of students after termination and without technology or benefits as well as for its breach of its contracts and causing emotional distress.

## FIRST CAUSE OF ACTION

(Discrimination Based on Religion in Violation of Title VII of the Civil Rights Act of 1964)

175)  Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as though fully set forth herein.

176)  At all relevant times, Plaintiff was an employee and Defendant was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

177)  Plaintiff is a member of a protected class based on religion (Jewish).

178)  Plaintiff was qualified for his position and performed his job duties satisfactorily.

179)  Defendant subjected Plaintiff to adverse employment actions, including but not limited to:

    a.  Denial of promotion;

    b.  Invention of new standards for promotion review;

    c.  Refusing to measure Plaintiff by objective standards for promotion review;

    d.  Denying the existence of FIRST, SECOND, and THIRD PEER REVIEWS;

    e.  Attempting to hide its "Do We Need You" desired results behind the "Are You Good Enough" review;

    f.  Soliciting the FALSE REVIEW;

    g.  Relying on the FALSE REVIEW;

    h.  Refusing to disclude the FALSE REVIEW after Plaintiff's notice;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

  i. Hallucinating uncomfortable students with the UNCOMFORTABLE WITH JEWS REVIEWS;

  j. Wrongful termination prior to completing teaching obligations;

  k. Removing technology access while still required to perform teaching obligations;

  l. Breaching the JANUARY 2023 CONTRACT;

  m. Refusing to even acknowledge the JANUARY 2023 CONTRACT after admitting that the DIRECTOR was entitled to enter into it.

180) The adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on religion.

181) Defendant's conduct constitutes unlawful discrimination in violation of Title VII.

182) As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered damages, including but not limited to lost wages, benefits, and emotional distress.

## SECOND CAUSE OF ACTION

(Discrimination Based on National Origin[3] in Violation of Title VII of the Civil Rights Act of 1964)

183) Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as though fully set forth herein.

184) Plaintiff is a member of a protected class based on national origin in that a Jewish person's national origin is the ancient nation of Israel as a land for the people descended from the tribes of the sons of Jacob from the bible and those who have joined the nation by the nation's rules (for example, Ruth).

185) Defendant subjected Plaintiff to adverse employment actions as described above.

---

[3] Insomuch as the Court challenging whether being Jewish is a matter of historical national origin, then the Plaintiff would likely amend to include ethnicity.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

186)   The circumstances of the adverse actions give rise to an inference of discrimination based on national origin.

187)   Defendant's actions constitute unlawful discrimination in violation of Title VII.

188)   As a direct and proximate result, Plaintiff has suffered damages as previously alleged.

## THIRD CAUSE OF ACTION

(Discrimination Based on Religion in Violation of the California Fair Employment and Housing Act)

189)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as though fully set forth herein.

190)   At all relevant times, Plaintiff was an employee and Defendant was an employer within the meaning of FEHA, Cal. Gov't Code § 12926.

191)   FEHA prohibits employers from discriminating against employees based on religion.

192)   Defendant discriminated against Plaintiff by subjecting him to adverse employment actions because of his Jewish religion.

193)   Defendant failed to take all reasonable steps necessary to prevent discrimination from occurring, in violation of Cal. Gov't Code § 12940(k).

194)   As a result, Plaintiff has suffered damages including lost earnings and emotional distress.

## FOURTH CAUSE OF ACTION

(Discrimination Based on National Origin in Violation of the California Fair Employment and Housing Act)

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

195)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs prior to this one as fully set forth herein.

196)   FEHA prohibits employers from discriminating against employees based on national origin.

197)   Defendant discriminated against Plaintiff on the basis of his national origin by engaging in the conduct described above.

198)   Defendant's actions violate Cal. Gov't Code § 12940(a).

199)   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages as alleged.

## FIFTH CAUSE OF ACTION

(Breach of MGMT 169 VERBAL CONTRACT and UNILATERAL MODIFICATION)

200)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs prior to this one as fully set forth herein.

201)   The Plaintiff and Defendant entered into an oral contract related to Plaintiff's services to reduce Defendant's spending on the practical courses in the UME by building a classroom component for MGMT 169 for which Plaintiff was promised to be able to continue to teach.

202)   Defendant promised Plaintiff that he could remain teaching this course whether he received the PROMOTION, or remained NSF Faculty pursuant to the CBA, or by a separate appointment as an adjunct faculty member.

203)   Plaintiff provided signficant value to Defendant outside of any APPOINTMENT based on his reliance on the promises in the MGMT 169 VERBAL CONTRACT.

204)   Plaintiff relied on Defendant's promises and performed his end of the contract.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

205)   Defendant did not fulfill its end of the contract by allowing Plaintiff to
continue to teach the course as Defendant had promised, first violated by Defendant's
UNILATERAL MODIFICATION which Plaintiff accepted.

206)   The breach of the MGMT 169 VERBAL CONTRACT and UNILATERAL
MODIFICATION was particularly egregious because Plaintiff paid the price for the pain
Defendant's decision caused students for a "Bait and Switch" before Plaintiff turned the
course into one of the top-rated courses in the UME.

207)   Defendant had at its disposal a method of fulfilling its obligations outside of
the union contract had it so wished to fulfill its promise to Plaintiff but failed to do so.

208)   Defendant reaffirmed its commitment to its remaining obligations in the
MGMT 169 VERBAL CONTRACT UNILATERAL MODIFICATION when it
negotiated the JANUARY 2023 CONTRACT.

209)   Defendant asked Plaintiff to work to teach MGMT 169 in the Spring of
2023, scheduled him to do so, asked him to hire a Teaching Assistant ("TA"), block out
his schedule, review students' applications, and approve or disapprove their admission.

210)   Plaintiff blocked out his schedule, hired a TA, and reviewed applications for
approval and disapproval.

211)   And yet, Defendant failed to hire and pay Plaintiff to do so in Spring of 2023
and going forward in violation of the agreement.

212)   Plaintiff was first noticed of the breach of contract on February 22, 2023
which is within the time period of the statute of limitations.

213)   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff
has suffered damages as alleged.

## SIXTH CAUSE OF ACTION

### (Breach of JANUARY 2023 CONTRACT)

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

214)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as fully set forth herein.

215)   Plaintiff and Defendant entered into another oral contract for building a new syllabus and for agreeing last minute to teach a new course for performing duties as it pertains to Social Entrepreneurship in the JANUARY 2023 CONTRACT.

216)   Defendant promised Plaintiff that he could remain teaching at UCLA outside of any APPOINTMENT for Defendant to be able to fulfill its obligations to Plaintiff including re-affirming its modified obligations under the MGMT 169 VERBAL CONTRACT and allowing Plaintiff to teach full-time at UCLA.

217)   Defendant represented that Plaintiff was teaching full time in Spring 2023, and the academic year 2023-2024 publicly, in furtherance of the JANUARY 2023 CONTRACT upon which Plaintiff relied.

218)   Plaintiff would not have agreed to teach Social Entrepreneurship absent Defendant's promises in the JANUARY 2023 CONTRACT.

219)   Plaintiff prepared for teaching in Spring 2023 and the following academic year and took specific actions to do so to his detriment.

220)   Plaintiff provided immense value to Defendant re-writing a more rigorous syllabus, developing frameworks and videos under UCLA's name, and creating national acclaim for the UCLA student outcomes from Social Entrepreneurship. These acts were not covered by any APPOINTMENT.

221)   Plaintiff relied on Defendant's promises and performed his end of the contract.

222)   Defendant did not fulfill its end of the contract by terminating Plaintiff at the end of February 2023 while the class was ongoing and failing to allow Plaintiff to teach for the time it had represented he was to do so.

223)   Defendant had at its disposal a method of appointing Plaintiff outside of the union contract had it so wished to fulfill its promises to Plaintiff but failed to do so.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

224)   Plaintiff was first noticed on February 22, 2023 of this breach of contract, which is within the time period for the statute of limitations.

225)   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages as alleged.

### SEVENTH CAUSE OF ACTION, *in the Alternative*

(Fraudulent Inducement in the Alternative)

226)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as fully set forth herein.

227)   The Plaintiff and Defendant entered into the MGMT 169 VERBAL CONTRACT and the JANUARY 2023 CONTRACT based on Defendant's representations.

228)   The Defendant represented that the head of the Price Center and/or the DIRECTOR of the UME were empowered to obligate Defendant and were capable of making agreements Plaintiff.

229)   Plaintiff reasonably relied on Defendant's representations.

230)   The alternative fact (not included in other counts) is that the Defendant knew the representations were false when it made them.

231)   The Defendant intended that Plaintiff be induced to rely on the false representations which he did.

232)   The Plaintiff was harmed by his reliance on the false representation.

233)   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages as alleged.

### EIGHTH CAUSE OF ACTION, *in the alternative*

(Unjust Enrichment In the Alternative)

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

234)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as fully set forth herein through the SIXTH CAUSE OF ACTION other than any paragraph which alleges the parties entered into the MGMT 169 VERBAL CONTRACT, its UNILATERAL MODIFICATION, or the JANUARY 2023 CONTRACT.

235)   The Defendant received large benefits from Plaintiff when the parties were not party to  a contract for work performed outside of an APPOINTMENT for which Plaintiff was not compensated.

236)   For example, the Plaintiff worked for Defendant after February 28, 2023 when any APPOINTMENT ended (and after Defendant claims any contract for Plaintiff's employment had terminated) through at least April 3, 2023.

237)   Defendant acted as if no contract existed by removing Plaintiff's benefits, removing Plaintiff's access to technology, and ensuring Plaintiff could not adequately teach his classes in front of the students even though Plaintiff then wrongfully believed he was bound by a contract.

238)   Defendant received benefit from Plaintiff's work which occurred well after even they claim the contract terminated (February 28, 2023). For example, Plaintiff submitted the grades for 95 students in April of 2023, allowing their completion of their class work well after the contract was terminated, yielding the Defendant approximately $300,0000 in tuition gained at the expense of Plaintiff.

239)   Defendant continued to promote Plaintiff as a faculty member on its websites and promoted to students well after they claim the contract terminated gaining from Plaintiff's reputation.

240)   Defendant gained from Plaintiff's work for classes in Spring 2023 such as hiring TA's, working with students, and admitting students into his classes.

241)   Defendant took advantage of adding its branding on Plaintiff's renowned videos to gain from Plaintiff's image and promotion well after February 28, 2023.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

242)   Further, Defendant never claims that Plaintiff agreed to work without benefits but not only demanded he do so, and forced him into a personal reputational disaster should he not have helped his students.

243)   Defendant's biggest gains included Plaintiff stepping in for Gayle Northrop's class and rewriting the course as a rigorous one on short notice. Plaintiff's decision to help the Defendant were to their extra benefit and required Plaintiff write his own syllabus for which he was not compensated and was part of no contract.

244)   Defendant also wrongfully gained from Plaintiff's assistance in creating a funded nationwide non-profit – ChildrenOfTheCourt.org  - which is now known nationwide as a UCLA-student founded organization, when Plaintiff guaranteed its funding.

245)   Likewise, Defendant has received credit at Plaintiff's own personal expense for being the founding social venture capitalist of the Legal Accountability Project as the UCLA students in his class assisted with the LAP's progress. Yet Defendant never recompensated Plaintiff for this benefit it received.

246)   Finally, Defendant received the benefit of Plaintiff's revamping the MGMT 169 class to save the number of classes needed to serve the UME students by reducing 15 faculty courses to three. Plaintiff also "took the hit" for the new class reviews after the "Bait and Switch" for which he wasn't compensated and Defendant wrongfully gained.

247)   It was Plaintiff's own success in reducing the number of faculty courses that led Defendant to refuse Plaintiff's PROMOTION since there were now fewer classes and ironically placing onus on the Bait and Switch to Plaintiff by relying on the FALSE REVIEW..

248)   Defendant's actions herein were wrongful by falsely representing to Plaintiff the existence of contracts and future promises of employment in exchange for his valuable services.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

249)  Defendant's gains were at Plaintiff's expense, without contract, and would be unjust to allow the Defendant to keep those gains without compensating Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief:

A. For a judgment in favor of Plaintiff and against Defendant on all causes of action alleged herein;

B. For compensatory damages, including but not limited to lost wages, benefits, and other remuneration, according to proof of an amount greater than $75,000;

C. For general damages for emotional distress, reputational harm, and mental anguish, according to proof;

D. For punitive damages where permitted by law, in an amount sufficient to punish and deter Defendant's wrongful conduct;

E. To name Plaintiff "Continuing Lecturer" or in the alternative Adjunct Faculty during the remaining period of the UME's existence or a like replacement;

F.  For attorney's fees and costs of suit incurred herein pursuant to 42 U.S.C. § 2000e-5(k) and Cal. Gov't Code § 12965(b);

G. For pre-judgment and post-judgment interest as permitted by law;

H. For such other and further legal and equitable relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

10th day of January, 2025

/s/Edward "Coach" Weinhaus/s/

EDWARD "COACH" WEINHAUS
Plaintiff in *Pro Per*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF