Edward "Coach" Weinhaus, Esq.
Legal Solved LLC
11500 Olive Blvd Suite 133
Creve Coeur, MO. 63141
314-580-9580
eaweinhaus@gmail.com
Plaintiff In *Pro Per*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD "COACH" WEINHAUS, | ) Case No. 2:25-cv-00262 JFW (ASx) |
| Plaintiff, | ) **FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| vs. | ) |
| THE REGENTS OF THE UNIVERSITY | ) Judge:      John F. Walter |
| OF CALIFORNIA | ) Mag. Judge: Alka Sagar |
| | ) Crtrm.:      7A |
| Defendant | ) Conf. Date:  June 2, 2025 1:15 pm |
| | ) **DEMAND FOR JURY TRIAL** |

---

## INTRODUCTION

1)      Plaintiff Edward "Coach" Weinhaus ("Plaintiff") brings this action against Defendant, The Regents of the University of California ("Defendant") for discrimination based on federal and state law, breach of contract (express or flawed express), fraud in a public interest setting, and unjust enrichment in the alternative.

2)      Plaintiff's departure from UCLA, the nation's **top**-rated public learning institution, as its **top**-rated entrepreneurship faculty, led to a student march on the business school's dean's office led by the incoming Student Body President, after reliance on Defendant's promises it breached.

3)      Defendant's actions relied primarily on one student's complaints about Plaintiff's religion and national origin, necessitating this action.

## JURISDICTION AND VENUE

4)      This Court has jurisdiction over the federal claims pursuant to 28 U.S.C. § 1331, as this action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

5)      This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy.

6)      Venue is proper in the Central District of California pursuant to 28 U.S.C. § 1391(b) because the unlawful employment practices were committed within this judicial district, and Defendant conducts business in this district.

## PARTIES

7)      Plaintiff is an individual residing in St. Louis, Missouri where he is a citizen.

8)      Defendant The Regents of the University of California is a public corporation and is the governing board of the University of California system, conducting substantial business activities in the State of California, including within this judicial district where Plaintiff was employed by Defendant's schools UCLA Anderson School of Management and UCLA School of Arts and Sciences (undergraduate).

9)      The Defendant has general hiring authority under California statute and freedom to contract for services outside of employment. It often does so as it did with Plaintiff outside of an employment arrangement.

10)     Defendant provides education which is a societal benefit. The production of an informed populate at institutions of learning is not a commercial transaction, such as leasing and purchasing property or contracting for a pension. It is in the social service area, designed to serve the interests of society by acting in the best interests of the students and general populace.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

11)    "Regents," "UCLA," "UCLA Anderson," or "Anderson" hereafter shall stand for Defendant herein.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12)    On December 14, 2023, Plaintiff timely filed a charge of discrimination with the California Department of Fair Employment and Housing ("DFEH") alleging discrimination based on religion and national origin.

13)    The DFEH issued a Right-to-Sue Notice to Plaintiff dated July 23, 2024.

14)    Plaintiff's charge was dual-filed with the Equal Employment Opportunity Commission ("EEOC").

15)    The EEOC issued a valid Notice of Right to Sue dated October 15, 2024.

16)    Plaintiff has exhausted all administrative remedies and has satisfied all conditions precedent to the commencement of this action.

## BACKGROUND DISCRIMINATION FACTUAL ALLEGATIONS

17)    Plaintiff was employed by Defendant as a faculty lecturer, controlled by the Non-Senate Faculty (NSF) Unit 18 collective bargaining agreement ("CBA") from August 1, 2016 until December 31, 2022, performing duties in an exceptional manner based upon reviews written by his supervisors, UCLA administrators, and students. He served 18 faculty quarters and multiple 'uncounted' summer quarters *in that role*.

18)    Nothing in the CBA or any written contract prevented Plaintiff from entering into other contracts with Defendant outside of the CBA for time-periods covered by a CBA-controlled appointment, nor for time-periods outside of a CBA-controlled appointment.

19)    According to UCLA Anderson's faculty review database, through his employment as a Faculty Lecturer, Plaintiff led the rankings of Entrepreneurship faculty at UCLA. In short, Edward "Coach" Weinhaus is the highest-rated entrepreneurship faculty at UCLA.

20)    As of January 1, 2023, Plaintiff was purportedly "re-employed" by Defendant as a putative Continuing Faculty Lecturer although not pursuant to any

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

controlling CBA. He worked in this capacity until even after his termination on February
28, 2023 through to April 3, 2023 as described hereafter.

21)    Plaintiff is Jewish, which is both a religious affiliation and, in this context, is
his national origin.

22)    In the fall of 2022, Defendant formed a second contract with Plaintiff to
compensate him for additional services-provided-beyond-employment-as-a-class
lecturer. The compensation paid to Plaintiff would be in the form of new teaching
opportunities whether in an adjunct or CBA-controlled capacity, including but not
limited to Spring 2023 quarter, and the following academic year.  ("JANUARY 2023
CONTRACT", whose terms will be further described below).

23)    Additionally, the Defendant caused information about the parties'
relationship to be spread throughout the university, different departments, and
technology systems upon which students and Plaintiff relied.

24)    Just a few of the examples are described in subparagraphs below and are
evidenced by writings attached as true and correct copies of conversations or images
from Defendant's internal systems as Exhibit A ("Defendant's Coordinated Activities To
Show It Was Compensating Plaintiff In the Societal Interest"):

    a. Defendant coordinated the participation of faculty, including Plaintiff, in
inter-department scheduling with other faculty coordinated by the UCLA
Anderson Price Center, the UCLA main scheduling system, and the UCLA
Undergraduate College of Letters and Science for Spring of 2023
scheduling;

    b. Through Defendant's coordinated efforts in the above subparagraph,
Defendant caused to be publicized through its human resource departments,
course approval departments, faculty scheduling departments, and
informational technology departments across UCLA Anderson and UCLA
Undergraduate College of Letters and Science the societal interest of

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff's provision of education to be listed in Spring of 2023 through Spring of 2024.

c.  Defendant, through the coordinated efforts of UCLA Anderson, the Price Center, and UCLA Undergraduate College of Letters and Sciences developed a methodology for students to select his section of a class rather than the other (or vice versa) for the Spring of 2023 Quarter.

d.  As a result of the above subparagraph, Defendant sent students to Plaintiff to review their request to join his section of the course in Spring of 2023 to provide the societal benefit of higher education;

e.  Students requested "PTEs" – permission to enroll in Spring of 2023 courses to Plaintiff which he managed, and accepted using access provided as part of Defendant's coordinated efforts;

f.  Defendant coordinated their HR and scheduling departments on an inter-college basis to have Plaintiff hire Teaching Assistants for Spring of 2023, which he did;

25)  In the MY UCLA system, Defendants included Plaintiff in their scheduling as a result of the promises it made to Plaintiff all the way out through Spring of 2024 – the end of the following school year, as pictured in EXHIBIT A.

26)  Having coursework entered into My UCLA can occur only through the Defendant's policies and procedures that authorize course assignments through authorized members of the Defendant to do so and only with great coordination between departments that follow the Defendant's policies and procedures.

27)  On or about February 22, 2023, Plaintiff received the first notice of adverse employment action. The Chairman of the Faculty of UCLA's Anderson School of Management, Sanjay Sood called Plaintiff and informed him that he would both not receive the compensation promised him in future teaching assignments and not be *allowed* to teach as a societal benefit after the Winter Quarter which terminated on April 3, 2023.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

28)    Defendant then wrongfully shut off Plaintiff's employment benefits and access to teaching technology such as Zoom and access to the student learning portal in March 2023, while demanding he continue to work for the Defendant through March 2023 and into April 2023. Susan Murray as an administrator for Defendant confirmed this information on a phone call on March 7, 2023. The Defendant sent further communications notifying Plaintiff he was a former employee.

29)    Defendant's negative employment action against Plaintiff were primarily based on soliciting, accepting, highlighting, and over-emphasizing one negative student review in a faculty review process. ("FALSE REVIEW"). The review was full of factual errors and demonstrated the student was upset about being "Bait and Switched" (*infra*) by the Defendant when it changed a key course, using Plaintiff's pedagogic skills to negotiate the shift.  The student review spent three sentences in content on Plaintiff. Two sentences were inaccurate about Plaintiff directed at his Jewish background and the third called the course "entertaining" even though still upset about the "Bait and Switch."

30)    The two negative comments related to Plaintiff's Jewish background were:

a.    "referred to himself frequently as 'the hardest drinking Jew in Chicago' and

b.    "He also taught every lesson about integrity or morality through Old Testament examples."

31)    The Defendant's defined curriculum required mention of Old Testament as well as Jain, Christian, and other faith morality for the coursework. Plaintiff has not resided in Chicago for more than a decade. Nonetheless, the student, although entertained after the Defendant's "Bait and Switch" took his/her wrath out on Plaintiff.

32)    Unlike any other review, the FALSE REVIEW was the only Defendant solicited of its own accord.

33)    Defendant compiled an entire file on Plaintiff's teaching background. One part of it (which relies on and references the rest of the file) shows Defendant, via then-Dean Tony Bernardo, specifically stating that he relied on the FALSE REVIEW as part of his assessment after Plaintiff raised an objection related to the discriminatory basis of

6

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

it. (The rest of Dean Bernardo's review is fantastical and nonsensical and cannot be viewed with any meaning without the whole file.)

34)     Upon information and belief, the FALSE REVIEW was improperly solicited as being:

      a. from a student during the *barred* time-period of COVID restrictions and

      b. from the Bait and Switch period of January 2020 through June 2021 which reflected the Defendant's actions, rather than Plaintiff's 'excellence' (it's a testament to Plaintiff that there weren't many more).

35)     Defendant, through its agents and employees, engaged in a pattern and practice of discrimination against Plaintiff based on his Jewish religion and national origin, including but not limited to:

a. Subjecting Plaintiff to derogatory comments about his Jewish background and religious texts during his CBA-mandated promotion review to continuing employment in 2022 and 2023 by soliciting, accepting, highlighting, relying upon, and over-emphasizing the FALSE REVIEW rather than discarding it;

b. Denying Plaintiff opportunities for advancement that were only denied him based on unreasonable criticisms in the first subparagraph none of which have been analogously applied to similarly situated non-Jewish employees (whether about their background, their faith, or as it relates to classic western foundational ideas based on Jewish texts); and

c. Imposing the harshest of disciplinary actions against Plaintiff compared to non-Jewish colleagues for similar or lesser student complaints by refusing his already *de-facto* promotion on the basis of the comments in the first subparagraph while still demanding he teach for Defendant *after* they terminated his employment, ended his benefits, and denied him access to teaching technology, and then breaching the other contracts with Plaintiff as described herein by refusing to pay for services rendered with teaching opportunities as a societal benefit.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

36)    On multiple occasions, Plaintiff reported the discriminatory treatment to the Defendant's relevant Faculty Committee or its leadership, but Defendant failed to take appropriate corrective action.

37)    As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer emotional distress, loss of income, and other damages.

## PLAINTIFF'S ACADEMIC, PROFESSIONAL, & TEACHING BACKGROUND

38)    Plaintiff earned a First-Class Degree with Honours from the London School of Economics in 1994 (BSc. Economics) and an MBA in Finance and Entrepreneurship from the University of Chicago's Booth School of Business ("Booth") in 2001 where he studied simultaneously with Nobel Prize Winners Eugene Fama and Richart Thaler.

39)    He garnered significant success in his professional capacity working for large banks and energy companies before becoming an entrepreneur where he built and exited multiple businesses before 2015.

40)    In 2015, he founded what would become a public company, Athena Bitcoin Global (Ticker: ABIT), *BlockTribune* (which would become the hallmark publication of Judiocracy LLC, exited 2024), entered Washington University School of Law as a 1L, and began his official teaching career at Washington University's Olin Business School.

41)    In 2016, Plaintiff joined UCLA's faculty under the auspices of the NSF 18 CBA terms in 2016.

42)    Plaintiff taught one quarter at UCLA Anderson to graduate MBA students before agreeing to focus his teaching on core courses in UCLA's Letters and Sciences competitive Undergraduate Minor in Entrepreneurship ("UME") under the auspices of UCLA Anderson's Price Center.

43)    Also in 2017, Plaintiff taught at Pepperdine University's Graziadio School of Management with the Price Center's permission so he could develop further curricula for UCLA courses.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

44)    At all times while in the employ of UCLA prior to earning his *Juris Doctor* in 2018, Plaintiff was enrolled as a full-time law school student in St. Louis (and while traveling to oversee the expansion of ABIT which was located in Chicago). Concurrently, he graduated *cum laude* from the University of Nicosia's Masters in Digital Currency program before enrolling in Washington University's LLM in Negotiation in Dispute Resolution (2019), and its *Juris Science Doctorae* program (dissertation submitted).

45)    In 2019, Booth hired Plaintiff as an Assistant Professor in Entrepreneurship (Adjunct) to teach its first class in Cryptocurrency and Blockchain, again with the permission of UCLA via Dr. Al Osborne, the then-head of the Price Center.

46)    After finishing his employment with Booth, Plaintiff became a licensed attorney in three states (California, Missouri, and Illinois), successfully passing the California bar exam and the Uniform Bar Exam in 2019.

47)    In 2021, Plaintiff served as President of ABIT when he helped it implement bitcoin-as-legal-tender for El Salvador, the first nation to do so. During this time, he conducted his courses at UCLA while back-and-forth between Latin America and California.

48)    In 2022, Plaintiff was feted by Slate.com as heading one of the 10 best podcast episodes based on litigation he filed and settled with a group of legal podcasters required by court order to correct the record on-air.

49)    Plaintiff now runs LegalSolved LLC a multi-state, multi-practice law firm.

50)    Plaintiff is also the CEO and Publisher of Judiciocracy LLC – the nation's largest publisher of Judicial Misconduct and Attorney Misconduct news – which he sold in 2024 to a group of Chicago-based investors. Plaintiff also serves as the international Director of UK company Pipeline Media Agency, Ltd.

51)    Since the end of his work with UCLA, Plaintiff has continued building his law practice, including becoming lead counsel for one of the nation's largest Freedom of Information Act non-profits, influencing the Georgia election rules ahead of the 2024

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

campaign, submitted his doctoral dissertation related to Cryptocurrency and Monetary Sovereignty, has taught both men's and women's strategy and law classes at Yeshiva University, served as a War Correspondent in Israel (breaking the "Dad, I killed 10 Jews" story[1] before the audio was released), started a humanitarian relief effort for Gazan non-combatants (GazaPassage.org) which largely predicted the Trump administration policy 15 months prior to the inauguration, and is recognized as America's "most aggressive judicial reformer." Although published in the *Wall Street Journal* (twice), *American Greatness*, the *St. Louis Jewish Light* as a Jewish issues commentator in 2023, he also won a finding for a class discrimination against a class of Muslims by the EEOC as a civil rights litigator in the same year (and earned judgment before the Hon. Lashonda Hunt N.D. Ill. 1:24-cv-01757 IRMO *Farah).*

52)    In short, Plaintiff's unmatched teaching record at UCLA was accompanied by a contemporaneous record of accomplishment in academic, business, civil rights, financial markets, government transparency, the legal profession, and world affairs.

53)    During his time at UCLA, he also became the full-time primary residential custodial parent of several of his children, further demonstrating his commitment to the societal benefit that being UCLA's top-rated entrepreneurship faculty entailed.

**PLAINTIFF'S HISTORY AT UCLA PRIOR TO PERFORMANCE REVIEW**

54)    When Plaintiff began working at UCLA in August of 2016, he was asked to acknowledge an "APPOINTMENT" pursuant to the CBA.

55)    This APPOINTMENT and all subsequent APPOINTMENTS are not a binding contract.

56)    Nothing in an APPOINTMENT, or any written contract related to it, claims to be the complete and exclusive statement of the terms of any agreement.

---

[1] https://globebanner.com/stories/650438227-dad-i-killed-10-jews-10-10-10-see-my-whatsapp-their-blood-is-on-my-hands-let-me-talk-to-mom-israeli-admiral-details-horror-of-massacre-body-cam-videos - Plaintiff's message sharing the story with the IDF prompted their release of the audio which has then become a staple of understanding the October 7th under a Western prism.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

57)     The parties through their actions intended to have agreements outside of the terms and topics of the APPOINTMENT and did so for many years which included the fully authorized actions of many departments through Defendant's coordination.

58)     The APPOINTMENT contains some of the following indicative terms:

    a.  UCLA had an option to Plaintiff's time and no obligation to pay him for that option when UCLA desired Plaintiff teach a course in any given quarter;

    b.  UCLA would list which course it *may* desire Plaintiff teach;

    c.  UCLA could cancel any of its purported obligations to Plaintiff at any time, (even after Plaintiff's work for a course began) and then not have to pay the promised money so long as it also terminated the course;

    d.  UCLA would list the courses covered by that particular "APPOINTMENT" and no other courses were covered by that APPOINTMENT unless listed, which did not prevent classes to be offered to Plaintiff outside of a CBA-covered appointment in exchange for services provided by Plaintiff;

    e.  The limited, one-sided purported APPOINTMENT indicative terms would often be overridden, modified, or added to by verbal adjustments from Defendant upon which Plaintiff often reasonably relied;

    f.  In some circumstances, Plaintiff  was told he was overpaid because Defendant unilaterally reduced the classwork available for Plaintiff to teach in a given APPOINTMENT – that is Defendant exercised its unilateral rights in the APPOINTMENT;

    g.  In some circumstances, Plaintiff was subject to a verbal agreement to teach in one quarter, did so, and then Defendant only paid in future academic years in Defendant's own complete ignoring of its own process for APPOINTMENT;

    h.  But the APPOINTMENT included no term by which an APPOINTMENT was deemed the exclusive arrangements between the parties.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

59)     When first hiring Plaintiff, UCLA informed him that it intended faculty such as Plaintiff to work elsewhere at the same time, so that an APPOINTMENT was *not* intended to be full-time employment. Later, UCLA APPOINTED Plaintiff to full-time (above 50%) teaching schedules.

60)     Plaintiff's first two classes at UCLA (one each of the first two quarters, which works on the quarter system) were uneventful. Plaintiff and the students experience suffered partially from inconvenient scheduling around Plaintiff's law school schedule.  His first class in the Fall of 2016 was for full-time MBA students on Thursday evening – the same night the MBA students drank and ate at a weekly social event outside the classroom. His next class was at 8 am on Monday mornings for undergrads – not exactly "prime teaching time."

61)     Plaintiff's student reviews for these two outings were unexceptional until he adjusted for the UCLA student body, ensuring his own academic obligations did not affect student schedules and therefore their learning outcomes and reviews.

62)     By Summer of 2017, with the above scheduling snafus worked out, Plaintiff hit his stride at UCLA, particularly relying on his proprietary instructional frameworks which he posts (free) on CoachForged.com.

63)     Plaintiff implemented an inverted classroom pedagogy. His unique coursework included:

    a.  The Iron Laws of Entrepreneurship (Eight Videos)

    b.  The OUTSIDE-IMPACTS Analysis of a startup (cribbing Professor Steve Kaplan at Booth) (15 videos)

    c.  Coach's Own Framework pitching a business plan including his proprietary "Three Prongs Of the Open", PSP, and QCOAT'ing methodologies (16 videos)

    d.  Entrepreneurial Marketing (6 videos).

64)     Plaintiff began earning consistently excellent student reviews thereafter.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

65)      Pursuant to the CBA, Plaintiff would receive a mid-period review after teaching nine quarters. Plaintiff 's mid-period review was conducted by Professor Emeritus Lippman.

66)      Professor Lippman saw and received no reviews that mentioned Plaintiff's Jewish heritage or religious faith, as the reviews that did so only came after this mid-term review.

67)      Professor Lippman stated to Plaintiff after reviewing Plaintiff's student reviews up through that time, "you will be promoted to Continuing Lecturer easily with these types of reviews."

68)      UCLA Anderson's Price Center, on behalf of Defendant under multiple different executives, increasingly leveraged Plaintiff's flexibility and pedagogical talents. UCLA eventually hired Plaintiff more so than any other non-tenured or non-managerial faculty teaching comparable courses.

69)      Plaintiff's demonstrable love for teaching, building educational content, learning frameworks, and particularly UCLA students allowed Defendant an opportunity to take advantage of his reliance on its promises.

70)      In all ways, Plaintiff's provision of educational services is a societal interest for the benefit of the special relationship forged between faculty and student to achieve the highest possible educational outcomes.

71)      UCLA employed Dr. Al Osborne as the head of the Price Center for UCLA Anderson (and then Interim Dean of Anderson) who took advantage of Plaintiff's business acumen, societal benefit mission-driven approach to teaching, and enthusiasm for the student body when UCLA Anderson found itself in a budget *pickle*.

   a.   UME's independent study classes (which are *experiential* in nature) were then <u>not</u> classroom-based but a core course to the competitive program – meaning all the students were required to take it or something like it;

   b.   UCLA then only allowed a maximum of seven students per faculty member due to it being an experiential and not a classroom course;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

c.   But, due to the number of students in the program, it meant that these students would require up to 15+ teaching courses (and faculty salaries) for a graduating class of 100 UME students (typically taking courses MGMT 195/199).

d.   That number of courses (and faculty salaries), Defendant found, was far too expensive.

e.   UCLA had earlier asked Plaintiff to teach a full-time load of sections or teach a class of these students over the summer to handle the large number of sections required by the seven student per class maximum requirement.

f.   The payment for these courses proved expensive to the UCLA Anderson budget and beneficial to Plaintiff who was the top faculty member handling these sections in both volume and ratings.

g.   Thus, in 2018, Dr. Osborne slotted Plaintiff to help build a unique hybrid replacement curriculum with both a *classroom*-based component along with the prior experiential version of the class for the purposes of including *more students per faculty course*, thereby reducing the faculty expense for providing education services to the UME students.

72)    Thus, Defendant asked Plaintiff, outside of any teaching assignments or CBA-controlled courses, to help it lower its payments to Plaintiff to Plaintiff's detriment.

73)    Plaintiff would not reasonably lower his own income without further promise. Defendant made such a promise upon which Plaintiff relied.

74)    Defendant asked Plaintiff to create a first draft of a syllabus for a new *hybrid* version of experiential learning with a classroom component and promised Plaintiff he would be able to teach the classroom-enabled-hybrid-version of the experiential class (MGMT 169) going forward when the class ultimately became approved should Dr. Osborne find his teaching skills satisfactory upon personal observation.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

75)    The promise to allow Plaintiff to provide the societal benefit of teaching was the compensation for Plaintiff's services outside of any APPOINTMENT.

76)    Defendant promised Plaintiff he could continue to teach the course so long as it was offered regardless of any CBA-controlled APPOINTMENT, such as through an adjunct position which could be offered independent of the NSF 18 CBA for lecturers.

77)    Plaintiff agreed to Defendant's terms and thus they formed a contract with UCLA Anderson in 2018 ("MGMT 169 CONTRACT").

78)    Dr. Osborne and Plaintiff co-lectured to give Dr. Osborne an opportunity to assess Plaintiff's classroom teaching skills.

79)    Dr. Osborne co-taught with Plaintiff twice and performed two peer reviews of Plaintiff's teaching ("FIRST TEACHING PEER REVIEWS").

80)    Plaintiff fully performed his obligations including planning to teach with Dr. Osborne, co-teaching with Dr. Osborne, passing Dr. Osborne's peer review, and building an initial syllabus.

81)    Plaintiff's performance of the MGMT 169 CONTRACT was based on Plaintiff's reliance on assurances that he could continue teaching at UCLA even absent an NSF 18 CBA or union-based APPOINTMENT, such as through an adjunct position all duly within Defendant's powers to contract for Plaintiff's services to assist help Defendant address its budget issue.

82)    At no point did Defendant Dr. Osborne, who served as Dean from 2018 through July 2019, ever inform Plaintiff that there were any further *conditions* to this promise. Defendant had access to student reviews, direct observation of Plaintiff's classroom skills, and determined that Plaintiff was the best faculty possible to teach the class as a societal benefit – a prescient move it would turn out.

83)    Plaintiff continued to perform even as Defendant then increased Plaintiff's obligations. Whereas other faculty were not required to teach sections of MGMT 195/199 (independent study) with any classroom component, Plaintiff was required to teach the same course with a classroom component in preparation for MGMT 169 in Fall

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Quarter 2019 as part of rendering his service to the MGMT 169 CONTRACT above and beyond his APPOINTMENT.

84)     Fall 2019 Quarter was the final offering of MGMT 195 before MGMT 169 went live the next quarter. Plaintiff had three classroom sessions for each of multiple MGMT 195 sections not required of other faculty who taught the same course. Plaintiff only agreed to perform this extra requirement, which was not part of any APPOINTMENT, based on the Defendant's promises to perform MGMT 169 CONTRACT.

85)     The Director of the UME program ("DIRECTOR") came to observe Plaintiff teaching this coursework in person for MGMT 195 in the Fall of 2019. ("SECOND TEACHING PEER REVIEWS"). DIRECTOR approved of Plaintiff's teaching skills and additionally relied on the MGMT 169 CONTRACT in planning for the UME Program.

86)     The students loved the course too, giving Defendant further confidence in its money-saving move to transition to the hybrid MGMT 169 course with a larger classroom and future faculty sessions than the existing MGMT 195. The student reviews for Plaintiff's Fall 2019 session were particularly excellent.

87)     The new hybrid course - MGMT 169 - would lower the formerly-required "faculty salary classes" to be cut 80% (down to three sections from 15 sections annually) thanks to Plaintiff's engagement and performance of the MGMT 169 CONTRACT.

88)     Further, because each instructor now had to handle 5x the amount of experiential work per class and the *students still maintained their 80 hours of work outside of the classroom*, Defendant insisted that the rigor of the *homework* be lessened because the students were additionally required to do 80 hours of work outside the classroom. That is, the experiential work took place of some (but not all) of traditional homework. This would by definition, make the course seem "Less rigorous" as required by Defendant.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

89)    Dr. Osborne, and his successors, also expected everyone in the class to receive an A grade and put this policy in writing. (In fact, Plaintiff modified this by giving several A+s and A-s to ensure students had some *skin in the game*, even if slightly <u>more rigorous</u> than laid out by Dr. Osborne.)

90)    The MGMT 169 course was approved by Defendant to teach for Winter (January) 2020 Quarter on or about November 14, 2019 and was immediately assigned to Plaintiff to teach thereafter as evidenced in writings such as class scheduling, listing Plaintiff as the faculty for societal benefit, and scheduling Plaintiff out into the future as required by the MGMT 169 CONTRACT. (e.g. see Exhibit A).

91)    Had Plaintiff been told he would not be allowed to teach the course outside of a CBA APPOINTMENT he would not have agreed to the MGMT 169 CONTRACT nor would he have provided the services that lowered his own income. He reasonably relied on Defendant's promises to his own detriment.

92)    As such, the Defendant earned the full benefit of Plaintiff's MGMT 169 CONTRACT performance by reducing the cost of teaching the UME Core Experiential Course by 80% to the savings of approximately $250,000 per year. Absent Plaintiff's performance, Defendant would not have been able to reduce the spending on faculty.

93)    Thus, by January 2020, Plaintiff was the sole faculty member at UCLA who could teach - and did teach - all three core courses of the UME (MGMT 160, 161, 169). Not even DIRECTOR (who served as Defendant's agent) then had that experience.

94)    Plaintiff's enthusiasm and skillset would be needed to maintain student satisfaction. The new 10-week classroom hybrid experience was a huge inconvenience to the students in the UME starting in the Winter 2020 – had they only taken 195 or 199 a quarter earlier they could have avoided the extra work involved that included

    a.  the 80 hours outside of the classroom,

    b.  the required classroom portion, and

    c.  homework.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

95)    They signed up for the UME when the in-person requirement with a 10-week course didn't exist where only the work in the above subparagraph a was required. This tactic of dramatically increasing the students' obligation is referred herein as the "Bait and Switch."

96)    The students were upset about the new requirements. They would blame the instructor – Plaintiff - for the new obligations his syllabus required of them (in lieu of the Defendant which used Plaintiff to engineer the scheme to save money).

97)    For tempering the student concerns, Defendant needed an instructor who would bear the student displeasure while teaching a new course which.

98)    Now, the FIRST and SECOND PEER TEACHING REVIEWS showed their purpose. Defendant had tested whether Plaintiff could "take the hit" in reviews and make the students appreciate the class as much as anyone at UCLA Anderson could, in exchange for keeping his role going forward which would put his potential PROMOTION (*infra*) at risk through a negative review (as indeed Defendant's solicitation…reliance on FALSE REVIEW did).

99)    The DIRECTOR made a further request of Plaintiff – to ensure the former experiential classes – MGMT 199 (Business Creation) and MGMT 195 (Entrepreneurial Internship) were both incorporated in the new class, Plaintiff would have to teach *two classes as one* – addressing and managing some students who were creating their own businesses and others who were interns at other entrepreneurial companies. This request was a new requirement not part of the MGMT 169 CONTRACT. As the courses (the old 195 and 199) had never been taught together before, upon information and belief, this request was also outside of any APPOINTMENT.

100)    The DIRECTOR also made clear that the workload could be adjusted to address this complexity so long as learning outcomes weren't affected.

101)    The first quarter (Winter 2020) of the new MGMT 169 class had some specific feedback upon which Plaintiff improved thereafter but even then scored a "5" median overall as the highest-possible ranking among the students.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

102)   Plaintiff taught the course three more times through Winter 2021 with consistency excellent results – highest medians of "5.0" every time.

103)   The DIRECTOR observed Plaintiff teaching again in at least 2020, 2021 ("THIRD TEACHING PEER REVIEWS").

104)   The DIRECTOR consistently spoke with Plaintiff about how the class was going and emphasized that the course was not intended to be "*typical-classroom* rigorous" because it was so "*outside-of-classroom* rigorous" with the 80-hour experiential requirement.

105)   The DIRECTOR also required Plaintiff to approve all experiential learning opportunities (ie review their business plans or internships) prior to student entry on a student-by-student basis as part of Plaintiff's ability to keep teaching the MGMT 169 course. That means Plaintiff had to examine outside companies if they were "entrepreneurial" enough and examine whether their own business ventures were viable. If not, it was Plaintiff's responsibility to manage the consequences through team formation. In some cases, Plaintiff found students an internship through companies where he had relationships such as being a board director. These tasks represented a new requirement not disclosed as part of the MGMT 169 CONTRACT or any CBA-controlled APPOINTMENT.

106)   Defendant expected Plaintiff to perform extra tasks as a further burden to Plaintiff. Plaintiff accepted the new obligations and performed these administrative tasks without compensation as a part of his attempts to continue to ensure Defendant's honored its obligations under the MGMT 169 CONTRACT. Plaintiff found the new obligations "an offer he couldn't refuse" as maintaining his teaching role is a societal benefit, due to other's providing the services don't provide the same level of societal benefit.

107)   For the Spring 2021 Quarter, Defendant demanded that the class size be nearly doubled again, well above the prior classroom limit of 35 to 60 to ensure there

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

was only *one* class in the Spring rather than the two required in a budget-saving, student learning outcome-harming move.

108)   Defendant confirmed the original ethos of the "hybrid course" restating again: "You are welcome to alter assignments as you see fit to adjust for the class size of 60 students as long as they yield the same learning and assessment." That is, the classroom work could be lowered to address the complexity of teaching.

109)   Plaintiff fought this move as being a detriment to the public benefit.

110)   Plaintiff succeeded by asking the Defendant to rely on experiential learning Dean Jeff Scheinrock's assessment. Dean Scheinrock agreed with Plaintiff.  Keeping the classroom to individualized experiences for each student as part of a classroom community was integral to the excellent learning outcomes which led to Plaintiff's unmatched "5.0" median reviews and the societal benefit of excellence in education.

111)   Plaintiff so successfully protected the Defendant from the student dissatisfaction hit for changing UME requirements mid-program that the course gained the attention of the DIRECTOR more than a year later, who himself sought to teach the class, once the *coast was clear* from the dissatisfaction from the first four quarterly cohorts for the Bait and Switch.

112)   DIRECTOR unilaterally began teaching the course only after the Bait and Switch cohorts had mostly finished the program serving as violation of the MGMT 169 CONTRACT.

113)   This renewed interest in the class from other faculty due to Plaintiff's excellent reviews ironically served to punish Plaintiff. The Defendant violated its obligations in the MGMT 169 CONTRACT to allow Plaintiff to continue *exclusively* teaching the course by allowing DIRECTOR to teach the same course at the same time in Spring 2021. In violation of the contract, Defendant gave DIRECTOR all the other sections of the course promised to Plaintiff but for one section per year.

114)   Defendant thus modified the MGMT 169 CONTRACT by promising Plaintiff he could teach one section per year of MGMT 169 and to otherwise make-up

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

missing classes with which it would compensate Plaintiff to ensure the continuing public benefit of Plaintiff providing education to students. ("MGMT 169 UNILATERAL MODIFICATION"). At no time did Defendant ever modify the promise to ensure Plaintiff would continue providing the public benefit of education as a teacher with or without a CBA-controlled APPOINTMENT.

### PLAINTIFF ACCOMPLISHMENTS TEACHING IN THE UME

115)   The Spring 2021 Quarter matchup between Plaintiff and Director – same time, randomly assigned students, same class - allowed perfect comparisons for the excellence of Plaintiff's instructional work and student outcomes. The only difference was that Plaintiff and DIRECTOR agreed that Plaintiff was the more qualified faculty to teach a class which contained *both* Business Creation and Entrepreneurial Internship students (as opposed to only the latter). That is Plaintiff had the harder pedagogical challenge and the significantly larger class, the provision of which for Plaintiff was in furtherance of societal benefit.

116)   In head-to-head rankings, Plaintiff's classroom ratings exceeded those of DIRECTOR. Further, Plaintiff's pedagogical tools had his students doing more "classroom work" voluntarily than the purported required work in the other section.

117)   The two went head-to-head again in the Spring of 2022. Plaintiff again exceeded DIRECTOR's rankings with a more complex class, more overall work being done, by more students. This time, Plaintiff scored a 4.92 average ranking out of 5 and again a median of 5.0.

118)   Plaintiff's general accomplishments for Defendant's UME include:

  a. He wrote and submitted another course for approval (besides MGMT 169 above) to teach without extra compensation outside of any APPOINTMENT, a unique law class "Entrepreneurial Strategy and the Law";

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

     b.  His median student reviews since the Summer of 2017 were a "5" – ie the highest possible – for 16 of 17 sections taught, save for one "4.5" in the elective Law class (Exh. C)..

     c.  He scored perfect "5" median rankings in teaching courses for the very first time in 5 different courses.

     d.  He scored perfect "5" average rankings multiple times in core courses;

     e.  His overall rigor average exceeded a "4.1" in all courses that didn't include the "Experiential" hybrid component for which Defendant demanded less rigor  and even those exceeded 3.5.

119)  Plaintiff's "distance from perfect" on all student rankings was ".35" (ie 5.00 minus 4.65) which was half the same distance from perfect than the MBA-level Entrepreneurship faculty (.76) which itself trailed overall MBA faculty (.69).

120)  Plaintiff's unparalleled student rankings in excellence among cohorts of undergrads (19-22 year olds) was remarkable for another reason. Plaintiff is one of the most intensely *provocative* faculty members generating student discussions.

     a.  In Winter 2020, he held the first ever "Pronoun Auction" where pronouns were treated as property to be bought and sold with monetary fines played with real cash;

     b.  His "Ethical Challenges Speed Round" had a 100% Success Rate for demonstrating that each voluntarily participating student was an "ethical hypocrite" based on their own revealed preferences;

     c.  In the Fall of 2022, Plaintiff held an optional session for students to perform an "anachronistic" analysis of "The Transatlantic Slave Trade As An Entrepreneurial Opportunity" for the purposes of understanding how those in the future will judge business people today for some of our actions;

     d.  Plaintiff openly discussed with students uses of the N-word historically (without ever uttering it), including the "niggardly" controversies, then-UCLA Law Professor Volokh's unapologetic use, the USC controversy over

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

a Chinese synonym, and most relevantly, over the students' own common usage of it in modern culture.

**DISCUSSIONS & DEAN COMPLAINT FOR BEING <u>TOO RIGOROUS</u>**

121)    Plaintiff was not without *any* imperfections, particularly regarding the difficulty of his exams (which were not allowed for MGMT 169 by Defendant). During exams in 2022, a technical glitch created the need for rescheduling an exam in Plaintiff's law class. A top student complained to then-Dean Tony Bernardo's office about the enforcement of time limitations on it because otherwise, she wrote: "Making this a 'take home' exam makes it so every single issue in the 9 page brief must be addressed and addressed properly— this means writing an extremely thorough and extensive response in order to fully answer the questions."

122)    But absent the one complaint to the Dean about being too rigorous of an examiner, students generally rewarded Plaintiff not with complaints but with accolades, including for the "slave trade" thought exercise. After another classroom discussion, a student wrote in his reviews: "Coach, you are one of the best, if not the best, most caring professor at UCLA. The discussions were engaging and I even got to be a Republican and defend [Kyle] Rittenhouse without being canceled. Best professor ever!"

123)    Plaintiff's teaching methodology turns "cancel culture" on its head – the classroom being a place for authentically exploring ideas, one's own and others, each gaining from the other. The rules on discourse were summarized for the students on Plaintiff's free teaching website. (See https://coachforged.com/mgmt-167-introduction-class-rules-on-discourse/ ). These rules and the student experiences from them constituted another benefit to the UME that Plaintiff uniquely brought and the ability to fully explore the limits of the First Amendment in the classroom setting for faculty and student is another public benefit of Plaintiff's provision of services to the student body via Defendant.

**ADDITIONAL CONTRIBUTIONS TO UCLA**

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

124)   Plaintiff had proven a valuable member of the UCLA Anderson community by referring in paying consulting clients to the MBA program which used the business clients for experiential project work for MBAs.

125)   A different part of the MBA experiential hired Plaintiff per an APPOINTMENT to work with students who had challenges, either interpersonal, or where Plaintiff's past business plan coaching would generate positive academic outcomes.

126)   In 2022, Defendant's demands on Plaintiff's time as promised coupled with his deadlines for his academic work at WashU (JSD) required Plaintiff step down from his role as Founder, President and Director of Athena Bitcoin Global (ABIT) in reliance on then promises made by Defendant with significant expense to Plaintiff.

**NSF 18 PERFORMANCE REVIEW PROCESS**

127)   In 2022, Defendant was obligated by the NSF 18 CBA to conclude Plaintiff's evaluation for promotion to Continuing Lecturer prior to the end of his 18th Quarter ("PROMOTION"). The CBA requires the review to have two *independent* parts

    a.   <u>Excellence</u>: (hereafter "Are You Good Enough")

    b.   <u>Staffing Need</u>: (hereafter "Do We Need You")

128)   The "Do We Need You" aspect is determinative – under the controlling CBA, if a faculty member was hired for a 19th Quarter, then the answer to "Do We Need You" is "yes," without question. No other answer could be legitimate, even if the school decided to reduce enrollment and class numbers.  Those are the terms of the CBA.

129)   Defendant did hire Plaintiff for a 19th Quarter prior to the completion of the "Are You Good Enough" review. By doing so, Defendant foreclosed any ability under a controlling CBA to conduct any negative "Do We Need You" determination. That answer was already legally, "Yes." Any actual use of  that reason is wrongful thereafter.

130)   The "Are You Good Enough" evaluation is intended to be based on a reasonable review by Defendant, as advised earlier by Emeritus Professor Lippman. Assessments related to "Are You Good Enough" are only controlled by the NSF 18

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

CBA for relevant employment and does not apply exclusively to Plaintiff's relationship with Defendant in the MGMT 169 CONTRACT and the JANUARY 2023 CONTRACT (*infra*) which required Defendant to consider Plaintiff for non-NSF18-CBA-controlled teaching opportunities.

131)    Plaintiff was recommended for PROMOTION 3-0 by the Defendant's *Ad Hoc* Committee (whose membership was wrongfully kept confidential). The Staffing Committee recommended Plaintiff 4-1 for PROMOTION even though that aspect of the "Do We Need You" review was already determined by the 19th Quarter APPOINTMENT. Upon information and belief, the Staffing Committee relied upon the FALSE REVIEW.

132)    Dr. Olav Sorenson, the new head of the Defendant's Price Center, who regularly met with Plaintiff, emphatically recommended Plaintiff's PROMOTION. The DIRECTOR, who worked for Sorenson, recommended Plaintiff for PROMOTION as well. In discussion of the promotion, Sorenson stated that DIRECTOR's assessment of "rigor" was unreliable generally, and that Sorenson viewed Plaintiff as rigorous.

## DEFENDANT RELIES UPON NEGATIVE COMMENTS ABOUT JEWISH BACKGROUND

133)    But thereafter, a problem arose, purportedly in the "Are You Good Enough" review. The Faculty Review Committee revisited the FALSE REVIEW even after the Ad Hoc Committee's 3-0 vote.

134)    Plaintiff had been a strong proponent of Jewish causes prior to notification of any adverse action, including:

    a.    Activity in domestic American politics supporting a supportive American policy towards Israel (see https://coachforged.com/how-i-accidentally-helped-president-obama-get-elected-and-didnt-keep-gov-blagojevich-out-of-prison/ );

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

b. Demanding an investigation on behalf of 200 parents of his local school
district for the internationally acclaimed, "Hit a Jew Day" (see
https://www.youtube.com/watch?v=l14KHxsSc58 );

c. Writing publicly how President Trump's values aligned with Jewish values
in 2018, including debunking an aspect of the *Charlottesville hoax* (see
https://stljewishlight.org/opinion/some-trump-policies-align-with-jewish-
values/ );

d. Advocating free speech for *pro*-Palestinian elementary school students in his
hometown of St. Louis to better engage in the battle of ideas to find truth as
part of his mission-driven public benefit of advocating for free speech (see
https://stljewishlight.org/opinion/letters-to-editor/letters-to-the-editor-of-the-
st-louis-jewish-light-2/ );

e. Defending Comedian Dave Chappelle against charges of anti-Semitism after
his Saturday Night Live monologue caused an internet kerfuffle (see
https://stljewishlight.org/news/antisemitism/comedian-dave-chappelle-
courageously-calls-out-antisemitism-and-adl-is-still-upset-about-it/ );

f. Serving as the Special Media Advisor to the Chairman of the Knesset's
Constitution Law and Justice Committee related to Israel's proposed Judicial
Reform which was creating international headlines and mass demonstrations
(see https://poachcoach.com/judicial-reformer/ ).

135) Plaintiff demanded the Defendant not to include any reliance on the FALSE
REVIEW due to the reviewer twice referencing Plaintiff's Jewish faith, bible, and
national origin in a negative and false fashion only as a result of the Bait and Switch of
Defendant.

136) Also, Plaintiff noted that it should not be relied upon, not only for its content
of being obviously prejudicial, but also for its falsity and for its open complaint about
the Bait and Switch, which was an issue the Defendant created. The review's time

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

coverage was the COVID time period  which was another basis for rejecting it per the Defendant's own policy.

137)   In short, Plaintiff's educational and professional accomplishments were always combined with his leadership in and prolific advocate of Jewish life. Any review that attacked him for that specific aspect of his *persona* are certainly free speech, as he himself would advocate, but none can be the basis of an *employment* decision.

138)   The Defendant refused to remove any comments related to his Jewishness as a basis for review at any step in the process.

139)   The Defendant would never rely on a review that included the N-word, or wouldn't refuse to promote a member of the Jain faith for mentioning that he were Jain.[2]

140)   But Defendant acted differently as it related to Plaintiff, relying on Plaintiff's Jewish faith and national origin to serve its other purposes – that is, to pretend that the "Do We Need You" review hadn't already been determined.

**DEFENDANT REVIEW DELAYS SPAWNS FURTHER BAD FAITH ACTS**

141)   Although Defendant was CBA-contractually required to conduct the review prior to the end of 2022, they failed to consider Plaintiff's PROMOTION at the October Faculty meeting.

142)   The delay was then followed by a widely-reported strike of teaching assistants which shook Defendant and made them wish to re-examine "Do We Need You" considerations in the only remaining analysis they had left - the "Are You Good Enough" review, turning it into a sham.

143)   UCLA Anderson's ranking had begun plummeting among its peer MBA schools leading to widely-reported drops in applications. Defendant resolved to lower the number of students it would accept to increase its ranking (by having a more accomplished - if smaller - student body). This would mean fewer classes for the *tenured*

---

[2] Plaintiff specifically points to Jainism because it is one of the 15 or so religion/ethnicities he covers in the class that led to this complaint and was approved by the committee that approved the MGMT 169 syllabus.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

faculty to teach, who were also contractually guaranteed teaching positions. That would mean fewer classes would be available for the existing faculty if they were to grant Plaintiff's PROMOTION.

144)   Defendant however was barred from answering "Do We Need You" with a "No" as much as it may have wanted to based on the NSF 18 CBA controlling language – the 19th Quarter hire had already happened.

145)   Instead, to achieve its desired result, it wrongfully relied on the FALSE REVIEW to improperly and unreasonably answer "No" to the remaining excellence question – "Are You Good Enough."

146)   Thus, Defendant finally purported to conduct a faculty review in December 2022 ("FACULTY REVIEW") under the pretense of an "Are You Good Enough" review because they were legally barred from a "Do We Need You" review.

147)   Thus, Defendant began inventing reasons to suggest that Plaintiff, who was objectively 'good enough'…wasn't.

148)   Defendant's purported "Are you good enough" review was steeped in procedural as well as substantive bad faith dealing, of which an incomplete list follows:

  a.   The Defendant invented a new qualification to determine if Plaintiff passed the "Are You Good Enough" standard that included *requiring* a faculty Peer Review but not listing that anywhere nor meet their obligation to purportedly provide one;

  b.   The Defendant 'failed' Plaintiff in the review for Defendant's own failure to provide the faculty Peer Review that they had just then invented as a requirement;

  c.   The Defendant failed to acknowledge the FIRST TEACHING PEER REVIEWS as meeting their invented requirement;

  d.   The Defendant failed to acknowledge the SECOND TEACHING PEER REVIEWS as meeting their invented requirement;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

e.  The Defendant failed to acknowledge the THIRD TEACHING PEER REVIEWS as meeting their invented requirement;

f.  The review failed to acknowledge that Defendant purposely lowered Plaintiff's "rigor" rating by requiring its hybrid MGMT 169 course to have less homework and no exam;

g.  The review invented another new standard demanding that "Rigor" student reviews *match* "Excellence" student reviews;

h.  The review relied on the non-present underling DIRECTOR's assessment of rigor rather than the UCLA Anderson Price Center's head (and DIRECTOR's boss) discrediting DIRECTOR's assessment

i.  The review invented another new standard that Plaintiff's Teaching Assistants all view Plaintiff as polite;

j.  The review invented facts related to Plaintiff's Jewish faith and national origin that didn't exist to fit their desired "Are You Good Enough" conclusions to meet their "Do We Need You" goals. For example, the review found that the negative comments in the FALSE REVIEW must have made other students uncomfortable with his Jewish background as much as the complaining student but, Defendant surmised, that those students didn't leave reviews because they must have dropped the class ("UNCOMFORTABLE WITH JEWS REVIEWS").

k.  But, this was an impossibility – nobody ever dropped the class as Defendant's own records show. The Defendant just made it up, thereby not only creating the "UNCOMFORTABLE WITH JEWS REVIEWS" but also fantasizing about students dropping classes – a complete 100% fabrication made up of a null set of students.

l.  The review failed to provide Plaintiff an opportunity to respond to the Staffing Committee Report which relied on the negative comment related to

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Jewish background, allowed the FACULTY REVIEW to rely on it, and led
to the UNCOMFORTABLE WITH JEWS REVIEWS hallucination.

m. The review failed to include an NSF 18 Faculty member after keeping the
membership of its Ad Hoc Committee confidential, completely against the
Defendant's own policy. See https://www.college.ucla.edu/aptoolkit/unit-18-
excellence-review-process-unit-18-participation/ . The removal of any NSF
18 Faculty for the Faculty Review was, upon information and belief,
intended to shield Defendant from witnesses for its liability in the instant
case.

**DEFENDANT CONTRACTS WITH PLAINTIFF OUTSIDE OF THE REVIEW**

149)    During the review process in October 2022 (the final 18th quarter under the
CBA) before the FACULTY REVIEW, the Defendant found itself in another teaching
jam. Long-time Social Entrepreneurship faculty Gayle Northrop would be unable to
teach her popular course in Winter (January) 2023 Quarter. Her Social Entrepreneurship
section was a UME Elective course and required no exam. A proposed backup instructor
would not fit the school's needs.

150)    Defendant asked if Plaintiff could change his schedule for the remainder of
the school year (Winter and Spring Quarters 2023) and move his classes around to
accommodate Defendant's needs to solve the missing faculty for Social
Entrepreneurship.

151)    Plaintiff stated that teaching a new (to him) class was a significant amount of
work not envisioned by any contractual relationship and asked if he could teach the class
as Professor Northrop had, which would require minimal time investment and use the
same guest lecturers she used. This would save a significant amount of work because
Professor Northrop's class was group-project based, without exam, and notoriously
lacked the kind of rigor Plaintiff's elective courses boast. It also heavily relied on guests
which significantly reduces the lecture workload (Plaintiff minimizes guest lecturing)/

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

152)  The DIRECTOR, on behalf of the Defendant, stated he expected Plaintiff would re-write the syllabus from scratch and make the course more rigorous, including a final exam, and that in no way would Plaintiff be permitted to use Defendant's prior guest lecturers for Professor Northrop's class.

153)  The motivation for the rigorous aspect was clear. The students for Social Entrepreneurship would be already upset by not having Professor Northrop as they would expect. They would be getting a "first-timer" in Plaintiff. Thus, the Defendant had Plaintiff, the UME's top-rated lecturer, implement his own rigorous examination model. That way, if there were a negative review of the course, at least the Defendant would pay a lower price including more rigor into the coursework in the future, the next time someone other than Professor Northrop taught it.

154)  Plaintiff agreed to invest in teaching the Social Entrepreneurship course subject to the following conditions:

    a.  that the previous and ongoing promises to teach MGMT 169 were upheld (MGMT 169 CONTRACT after the UNILATERAL MODIFICATION);

    b.  that Plaintiff would receive 5 (rather than 4) courses for the academic year 2022-23 to teach as part of the public benefit of working in higher education and helping students;

    c.  that his employment including promised future courses in Spring 2023 and academic year 2023-24 and forward were upheld outside of APPOINTMENT such that Plaintiff could be an Adjunct Faculty member (at significantly increased pay) rather than receive PROMOTION;

    d.  that Plaintiff be afforded all typical benefits of an employee such as access to school technology, campus facilities, his employment benefits, and timely payment during Winter 2023 quarter and beyond so long as he agreed to teach at UCLA and provided no basis for removal for cause.

155)  Many NSF 18 Faculty move from union/CBA-covered staff to Adjunct Faculty at UCLA Anderson and Plaintiff reasonably relied on Defendant's promises for

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

the same. Plaintiff's reliance on Defendant's promises to his detriment were thus reasonable.

156)   DIRECTOR accepted Plaintiff's requirements in agreeing to the JANUARY 2023 CONTRACT in the fall of 2022.

157)   Defendant reduced the agreement to a writing, adding Plaintiff to the course planning system for the "19th quarter" – Winter 2023, and courses in Spring 2023, Fall 2023, Winter 2024, and Spring 2024. The addition of Plaintiff's classes was intended to extend further when a new academic year's classes were uploaded. See various writings in Exhibit A.

158)   Plaintiff reasonably relied on these promises and representations, and Defendant and took action to his detriment to do so, much to Defendant's gain.

   a. He re-wrote the syllabus from scratch for Social Entrepreneurship outside any CBA-controlled APPOINTMENT. Plaintiff surveyed some of the top MBA and undergraduate entrepreneurship programs in the country to develop a curriculum including but not limited to Booth, Olin and Farmer.

   b. He fulfilled the request to teach a class with upgraded rigor,

   c. He adjusted his schedule and outside work obligations at his expense and opportunity cost to ensure he could increase his courseload to 'fulltime' for the academic year 2022-23 as Defendant listed in its system, and

   d.  He created novel frameworks for an otherwise stale and/or empty curriculum;

   e. He hired Teaching Assistants for Spring 2023 Quarter;

   f. He completed syllabi for the Spring 2023 Quarter;

   g. He reviewed students and admitted them especially into his courses for the Spring 2023 Quarter.

159)   The Defendant coordinated all of these activities through normal processes and procedures including the writings in Exhibit A which included listing Plaintiff in their course directory out 1-2 years in the future even without APPOINTMENT.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

160)   Although of Defendant's actions confirmed that DIRECTOR and the Price Center had the authority to contract with Plaintiff outside the CBA, it did so again on a call during Winter 2023 Quarter on or about February 17, 2023, less than a week before the adverse action.

## PERFORMANCE UNDER THE JAN. 2023 CONTRACT OUTSIDE THE CBA

161)   Plaintiff wrote the new curriculum for the Social Entrepreneurship class in such a manner to accrue maximum value to Defendant.

  a. He instituted a rigorous syllabus including a Final Exam
  b. Developed the MIAM-B framework (see https://coachforged.com/mgmt-167-introduction-miam-b-social-venture-analytic-tool/ )
  c. Built a Social Entrepreneurship analytic website  https://Socialyzer.org
  d. Produced and published a video series for video instruction ( https://coachforged.com/#mgmt167-1 ; https://coachforged.com/#mgmt167-2 ; https://coachforged.com/#mgmt167-3 )
  e. Created Two Class Projects, one of which has become a nationwide leader in judicial reform and is still run by a former class member (https://ChildrenOfTheCourt.org )
  f. Brought in a separate guest speaker as a leader in LegalTech which led to Plaintiff being the Founding Social Venture Capitalist of the Legal Accountability Project's Judicial Clerkships Database.

162)   Plaintiff planned his future academic career by refusing job opportunities given the promises and representations made by Defendant in the JANUARY 2023 CONTRACT.

163)   Defendant marketed the courses taught by Plaintiff, its top-rated UME faculty, to students and gained from his reputation for future quarters.

164)   Plaintiff performed under the JANUARY 2023 CONTRACT. Defendant failed to perform under it.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

a. Defendant did not deliver the future opportunities to teach in higher education for the public benefit as promised.

b. Defendant began removing Plaintiff's benefits on February 28, 2023.

c. Plaintiff had to teach the Winter 2023 course without full access to health benefits or access to teaching technology.

d. Defendant forced Plaintiff to sign more agreements just to finish teaching the class (none of which preclude this action on their face by Plaintiff's insistence);

e. Defendant humiliated Plaintiff, a licensed professional, in front of his students by both demanding he teach and by telling the students he was no longer employed while at the same time removing his access to teaching tools.

### ADVERSE EMPLOYMENT ACTION NOTICE

165)   Plaintiff met with Faculty Chairman Sanjay Sood on or about January 18, 2023 to discuss the inappropriate nature of the FACULTY REVIEW which could become actionable upon Dean Bernardo's review. Chairman Sood confirmed the general basis of the Faculty Review as having been conducted inappropriately, having invented standards, and that he disagreed with its conclusion.

166)   As a result of that meeting, Chairman Sood informed Dean Tony Bernardo that he believed Plaintiff deserved the PROMOTION – that he indeed met the "Are You Good Enough" standard to counteract the effect of the FACULTY REVIEW.

167)   On February 22, 2023, Chairman Sood informed Plaintiff by phone call that his employment would terminate in six days as a result of Dean Bernardo's decision[3].

168)   Even Dean Bernardo's decision would not be final were the JANUARY 2023 CONTRACT adhered to because Defendant had placed Plaintiff in its campus-

---

[3] Although this Complaint references Dean Bernardo's 'decision' his letter is replete with external references including explicitly to the FALSE REVIEW. No review of his letter can be conducted absent access to the fully available file which is in the public record.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

wide systems as teaching a full-time schedule – removing the final decision from Dean Bernardo. But Defendant reneged on that too after Plaintiff had relied upon it.

169)   This date serves as the first notice of a negative employment action.

170)   Chairman Sood stated that Dean Bernardo had only made the decision that prior weekend and that there was no further information to be shared. Both statements were false, Plaintiff would learn.

171)   The Defendant had sent a letter a week prior noting that Plaintiff would not be offered further employment as NSF 18 Faculty.

172)   The Defendant refused to release the basis for the determination or the letter until Plaintiff stated he would exercise his rights to physically inspect his files.

173)   Dean Bernardo explicitly referenced his reliance on the discriminatory FALSE REVIEW and continued bad faith behavior of inventing "Are You Good Enough" standards to achieve the "Do We Need You" desired outcome.  In short, Dean Bernardo's assessment ("COVER UP LETTER"), after being hidden from Plaintiff, was more subterfuge to cover-up the Faculty's reliance on discrimination-based content.

174)   The list of obvious and self-rebutting claims from Dean Bernardo's COVER UP LETTER is too long to analyze, but is evident from the record of information he reviewed and referenced.

**DEFENDANT SHUTS DOWN EMPLOYMENT DURING CLASS CAUSING STUDENT "DON'T POACH COACH" PROTEST MARCH ON DEAN'S OFFICE**

175)   After Chairman Sood's notification on February 22, 2023, Plaintiff was removed from employment at UCLA at the end of that month.

176)   But there was a problem. Plaintiff was still teaching through Winter quarter which included multiple class sessions in March 2023, proctoring a final exam, grading exams, giving grades for the class, and addressing student concerns that make the quarter to extend into April 2023.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

177)   In fact, Defendant relied on Plaintiff's services and his contractual obligations he performed from the JANUARY 2023 CONTRACT well past February 28, 2023.

178)   The students, many of whom were registered for Plaintiff's Spring 2023 classes and working with him in preparation for it, were upset when they learned of the Defendant's actions.

179)   Their ire was exacerbated when Defendant removed Plaintiff's access to teaching technology in front of them which delayed class and negatively affected their educational outcomes.

180)   As a result, a week later, the incoming President of the UCLA Undergraduate Student Body, Naomi Hammonds, organized a march on UCLA Anderson's Dean's Office using the chant, "Don't Poach Coach." (A video of the classroom aspect of the march can be seen at https://DontPoachCoach.com ).  ("DON'T POACH COACH STUDENT MOVEMENT").

181)   No other faculty member at Anderson has ever been the beneficiary of this level of student support.

182)   Chairman Sood informed one or more of the DON'T POACH COACH STUDENT MOVEMENT participants that the Defendant was barred *by the union* from keeping Plaintiff as an employee through the remainder of Winter Quarter and for further assignments as promised through both the MGMT 169 CONTRACT / UNILATERAL MODIFICATION and the JANUARY 2023 CONTRACT.

183)   Plaintiff continued to work for Defendant although no longer employed through April 3, 2024 when he submitted final grades and responded to student queries.

**UNION REFUSED TO PRESS CLAIMS ABOUT NON-CONTRACTUAL WORK**

184)   The UC-AFT CBA provided for union representation in arbitration, should the union wish to pursue it, against the University for violations of the CBA.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

185)   The union was unable to pursue Plaintiff's claims fully because Plaintiff's claims were not based on a CBA contract at all – the Defendant and Plaintiff's January 2023 Contract did not fall under any CBA.

186)   Further, the 19th Quarter employment also technically could not conceivably have been controlled by the CBA Lecturer Series because it was after the 18th Quarter - the time for which the review was required to have been completed, but wasn't.

187)   During the Union's evaluation whether to pursue its limited claims versus the full claims in this action, the Defendant employed more bad faith tactics to incentivize the union not to do so. In a final analysis, the union claimed not to be able to pursue claims because the Student Reviews weren't available to them (even though this is the Defendant's responsibility).

## DEFENDANT ACCRUED EXCESSIVE VALUE FROM PLAINTIFF OUTSIDE OF DEFENDANT'S VIEW OF A CONTRACT

188)   Plaintiff's Winter 2023 Quarter teaching Social Entrepreneurship left a mark on the entire country, through what became the class' unique approach Judicial Reform leading to two projects which have garnered attention from the media and judicial officers nationwide.

189)   As one of his class projects, Plaintiff conceived of "Children of the Court" – a two-part approach to helping fix the family law system: a) advocating for only judges with parental experience (or part of the foster system) to rule on parental rights cases and b) helping adult children visit the courtroom where much of their childhood may have been decided – "Children Holding Courts Accountable."

190)   Additionally, Plaintiff allowed a visitor to speak to the class, one of the floundering founders of the Legal Accountability Project ("LAP") – a legaltech non-profit hoping to get off the ground but unable to do so for lack of funding. The sputtering leader was one of Plaintiff's WashU law classmates. A Kirkland Ellis partner, which had invested in Plaintiff's crypto company, asked Plaintiff to help get LAP off the ground

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

since the young woman leading it needed assistance with capital raising, startup basics, technology, governance, and judicial reform basics.

191)  In both instances, Plaintiff assigned the class to give advice to the projects.

192)  After the Defendant terminated Plaintiff's employment, Plaintiff ensured both had funding. He became the Founding Social Venture Capitalist of the LAP and garnered a court enforced funding of Children of the Court – a decision the student's helped make. Both organizations made headlines for their work in judicial reform. Children of the Court has instigated litigation against courts for refusing access to public proceedings and attorney disciplinary bodies for restricting free speech in the judicial reform context. Plaintiff caused the LAP to finally launch the Judicial Clerkships Database thanks to Plaintiff's funds and management. Next, Plaintiff created "LAP Pledge" which later drew the ire of the federal judiciary ethics committee for allowing an individual judge to promote his/her own obeisance to accountability to his/her own staff. UCLA students in the class can now add, to already-impressive CV's, their distinct work in helping create two of the nation's leading judicial reform organizations based on participation the novel and rigorous Social Entrepreneurship coursework Plaintiff instituted in the Winter of 2023.

193)  Children of the Court is still run by a former student in the class.

194)  The value of these organizations does not accrue to shareholders but rather to the public and to the credit of UCLA's UME, which is promoted as the founding location of the organizations' funding.

195)  But UCLA has received that credit unjustly having terminated any contract (whether APPOINTMENT whose period ended February 28, 2023 or the JANUARY 2023 CONTRACT).

**PLAINTIFF EXPERIENCED DAMAGE DUE TO DEFENDANT'S ACTIONS**

196)  As a direct result so Defendant's wrongful conduct, Plaintiff experienced DAMAGES including but not limited to:

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

   a.  Plaintiff experienced emotional damages as a result of Defendant's actions after Plaintiff relied on Defendant's many breached promises;

   b.  Plaintiff experienced emotional damages as a result of Defendant's actions discriminating against for his Jewish background;

   c.  A delay, still ongoing, to earning his doctoral research degree as a result of Defendant breaching its contracts and causing emotional distress;

   d.  Lost income and benefits as a result of breach of contract as a result of Defendant breaching its contracts and causing emotional distress

197)  Plaintiff experienced further humiliation and reputational damage from the Defendant's actions requiring Plaintiff to teach in front of students after termination and without technology or benefits as well as for its breach of its contracts and causing emotional distress.

198)  Most significantly, Plaintiff and the public have now lost the public benefit from proper higher education as provided when Plaintiff is afforded the teaching opportunity many-times promised by Defendant.

## FIRST CAUSE OF ACTION

(Discrimination Based on Religion in Violation of Title VII of the Civil Rights Act of 1964)

199)  Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as though fully set forth herein.

200)  At all relevant times, Plaintiff was an employee and Defendant was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

201)  Plaintiff is a member of a protected class based on religion (Jewish).

202)  Plaintiff was qualified for his position and performed his job duties satisfactorily.

203)  Defendant subjected Plaintiff to adverse employment actions, including but not limited to:

   a.  Denial of promotion;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

b.  Invention of new standards for promotion review;

c.  Refusing to measure Plaintiff by objective standards for promotion review;

d.  Denying the existence of FIRST, SECOND, and THIRD PEER REVIEWS;

e.  Attempting to hide its "Do We Need You" desired results behind the "Are You Good Enough" review;

f.  Soliciting the FALSE REVIEW;

g.  Relying on the FALSE REVIEW;

h.  Expressly relying on the discriminatory FALSE REVIEW after Plaintiff's notice;

i.  Hallucinating uncomfortable students with the UNCOMFORTABLE WITH JEWS REVIEWS;

j.  Wrongful termination prior to completing teaching obligations;

k.  Removing technology access while still required to perform teaching obligations;

l.  Breaching the JANUARY 2023 CONTRACT;

m. Refusing to even acknowledge the JANUARY 2023 CONTRACT after admitting that the DIRECTOR was entitled to enter into it.

204)  The adverse employment actions occurred under circumstances giving rise to an inference of discrimination based on religion.

205)  Defendant's conduct constitutes unlawful discrimination in violation of Title VII.

206)  As a direct and proximate result of Defendant's unlawful actions, Plaintiff has suffered damages, including but not limited to lost wages, benefits, and emotional distress.

**SECOND CAUSE OF ACTION**

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

(Discrimination Based on National Origin[4] in Violation of Title VII of the Civil Rights Act of 1964)

207)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as though fully set forth herein.

208)   Plaintiff is a member of a protected class based on national origin in that a Jewish person's national origin is the ancient nation of Israel as a land for the people descended from the tribes of the sons of Jacob from the bible and those who have joined the nation by the nation's rules (for example, Ruth).

209)   Defendant subjected Plaintiff to adverse employment actions as described above.

210)   The circumstances of the adverse actions give rise to an inference of discrimination based on national origin.

211)   Defendant's actions constitute unlawful discrimination in violation of Title VII.

212)   As a direct and proximate result, Plaintiff has suffered damages as previously alleged.

## THIRD CAUSE OF ACTION

(Discrimination Based on Religion in Violation of the California Fair Employment and Housing Act)

213)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as though fully set forth herein.

214)   At all relevant times, Plaintiff was an employee and Defendant was an employer within the meaning of FEHA, Cal. Gov't Code § 12926.

215)   FEHA prohibits employers from discriminating against employees based on religion.

---

[4] Insomuch as the Court challenging whether being Jewish is a matter of historical national origin, then the Plaintiff would likely amend to include ethnicity.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

216) Defendant discriminated against Plaintiff by subjecting him to adverse employment actions because of his Jewish religion.

217) Defendant failed to take all reasonable steps necessary to prevent discrimination from occurring, in violation of Cal. Gov't Code § 12940(k).

218) As a result, Plaintiff has suffered damages including lost earnings and emotional distress.

## FOURTH CAUSE OF ACTION

(Discrimination Based on National Origin in Violation of the California Fair Employment and Housing Act)

219) Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs prior to this one as fully set forth herein.

220) FEHA prohibits employers from discriminating against employees based on national origin.

221) Defendant discriminated against Plaintiff on the basis of his national origin by engaging in the conduct described above.

222) Defendant's actions violate Cal. Gov't Code § 12940(a).

223) As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages as alleged.

## FIFTH CAUSE OF ACTION

(Breach of MGMT 169 CONTRACT and UNILATERAL MODIFICATION, Breach of JANUARY 2023 CONTRACT, and BREACH OF FLAWED EXPRESS CONTRACTS)

224) Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs prior to this one as fully set forth herein.

225) The Plaintiff and Defendant entered into a contract related to Plaintiff's services to reduce Defendant's spending on the practical courses in the UME by building a classroom component for MGMT 169 for which Plaintiff was promised to be able to continue to teach.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

226) The contract was entered into outside any CBA-controlled APPOINTMENT.

227) Defendant promised Plaintiff that he could remain teaching this course whether he received the PROMOTION, or remained NSF Faculty pursuant to the CBA, or by a separate appointment as an adjunct faculty member. The Defendant would act within its statutory bounds to compensate Plaintiff in whatever manner it could such that the role included being able to teach the course.

228) Plaintiff provided significant value to Defendant outside of any CBA APPOINTMENT based on his reliance on the promises in the MGMT 169 CONTRACT.

229) Plaintiff relied on Defendant's promises and performed his end of the contract.

230) Defendant did not fulfill its end of the contract by allowing Plaintiff to continue to teach the course as Defendant had promised, first violated by Defendant's UNILATERAL MODIFICATION which Plaintiff accepted as he risked retaliation if he had objected.

231) The later breach of the MGMT 169 CONTRACT and UNILATERAL MODIFICATION was particularly egregious because Plaintiff paid the price for the pain Defendant's decision caused students for a "Bait and Switch" before Plaintiff turned the course into one of the top-rated courses in the UME.

232) Defendant had at its disposal any number of methods of fulfilling its obligations outside of a CBA APPOINTMENT had it so wished to fulfill its promise to Plaintiff but failed to do so.

233) Defendant reaffirmed its commitment to its remaining obligations in the MGMT 169 CONTRACT UNILATERAL MODIFICATION when it negotiated the JANUARY 2023 CONTRACT.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

234)   Defendant asked Plaintiff to teach MGMT 169 in the Spring of 2023, scheduled him to do so, asked him to hire a Teaching Assistant ("TA"), block out his schedule, review students' applications, and approve or disapprove their admission.

235)   Defendant reduced its obligations under the agreement and its intentions to writing by entering Plaintiff into its My UCLA system and other university systems for course listings, signups, and TA hirings for the Spring 2023 class.

236)   Defendant reduced its obligations under the agreement and its intentions to writing by entering Plaintiff into its My UCLA system for class listings out through Spring of 2024, the latest it went.

237)   Plaintiff blocked out his schedule, hired a TA, and reviewed applications for approval and disapproval for the Spring of 2023 in reasonable reliance on Defendant.

238)   Plaintiff blocked out his schedule and planned his career around Defendant's promises reduced to writing for the foreseeable future.

239)   And yet, Defendant failed to allow Plaintiff to teach and compensate him for the same in Spring of 2023 as well as going forward in violation of the agreement.

240)   Plaintiff was most recently noticed of the breach of the MGMT 169 CONTRACT with UNILATERAL MODIFICATION on February 22, 2023 which is within the time period of the statute of limitations.

241)   Plaintiff and Defendant entered into another contract for building a new syllabus and for agreeing last minute to teach a new course for performing duties as it pertains to Social Entrepreneurship in the JANUARY 2023 CONTRACT.

242)   Defendant promised Plaintiff that he could remain teaching at UCLA outside of any CBA APPOINTMENT for Defendant to be able to fulfill its obligations to Plaintiff including re-affirming its modified obligations under the MGMT 169 CONTRACT and allowing Plaintiff to teach full-time at UCLA.

243)   Defendant represented that Plaintiff was teaching full time in Spring 2023, and the academic year 2023-2024 publicly, in furtherance of the JANUARY 2023 CONTRACT upon which Plaintiff relied.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

244)   Defendant reduced to writing these intentions to fulfill its end of the contract under any possible statutorily allowable method by listing Plaintiff in its My UCLA system out through Spring 2024 (which was intended to extend further when a new academic year's classes were uploaded), upon which the Plaintiff relied.

245)   Plaintiff would not have agreed to teach Social Entrepreneurship absent Defendant's promises in the JANUARY 2023 CONTRACT.

246)   Plaintiff prepared for teaching in Spring 2023 and the following academic year and took specific actions to do so to his detriment.

247)   Plaintiff provided immense value to Defendant re-writing a more rigorous syllabus, developing frameworks and videos under UCLA's name, and creating national acclaim for the UCLA student outcomes from Social Entrepreneurship. These acts were not covered by any CBA APPOINTMENT and were only covered by the contract which the Defendant was statutorily authorized to make.

248)   Plaintiff relied on Defendant's promises and performed his end of the contract.

249)   Defendant did not fulfill its end of the contract by cutting off Plaintiff's benefits and ability to teach his existing class in the Winter 2023 quarter and then failing to compensate Plaintiff for his performance under the contract.

250)   Defendant had a statutorily allowable method fulfilling its promises to Plaintiff outside of any CBA-controlled APPOINTMENT had it so wished but failed to do so.

251)   Should the Court find that the express written details and agreements to the parties lead to a flaw in an express contract with the MGMT 169 CONTRACT and the JANUARY 2023 CONTRACT, then Plaintiff alleges an express contract with a flaw with the irregularity stemming from the bad faith conduct of Defendant.

252)   No party could have foreseen that the Defendant would act in bad faith or to "create its own dilemma" given the Plaintiff's performance, particularly as a result of the

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

massive amount of coordination Defendant showed in its conduct and writings to compensate Plaintiff for his contract performance.

253)    Defendants, through their purportedly authorized representatives and campus-wide coordination, expressly agreed to allow Plaintiff to continue teaching MGMT 169 as long it was offered and to continue teaching at UCLA even if via a non-CBA controlled APPOINTMENT, in exchange for Plaintiff's work in developing MGMT 169 coursework, and for stepping in to teach Social Entrepreneurship in a pinch.

254)    These agreements were evidenced by writings such as those listed in Exhibit A.

255)    Further, the Defendant accepted the student cost savings from Plaintiff's work in making the MGMT 169 course less faculty (expensive) heavy, and his new curriculum with more rigor for Social Entrepreneurship.

256)    Alternatively, Plaintiff requests the Court find the breach of an implied contract – not for employment – but for compensation for the services provided under the JANUARY 2023 CONTRACT and the MGMT 169 CONTRACT, to be paid with teaching opportunities in lieu of direct financial compensation.

257)    Plaintiff was first noticed on February 22, 2023 of a breach of the JANUARY 2023 CONTRACT or, if found as flawed-express contracts, which is within the time period for the statute of limitations.

258)    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered damages as alleged.

## SIXTH CAUSE OF ACTION, *in the Alternative*

### (Fraudulent Inducement in the Alternative)

259)    Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as fully set forth herein except for those that the Defendant's employees were authorized to enter into a contract with Plaintiff.

260)    All employees of Defendant were acting within the scope of their duties. Herein, the employees of Defendant who caused Plaintiff to enter into the MGMT 169

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

CONTRACT and the JANUARY 2023 CONTRACT and who expressed them into writing such as in Exhibit A, are all liable to Plaintiff for their intentional and willful acts to induce Plaintiff fraudulently as expressed in this count.

261)   As such, Defendant is vicariously liable for the actions of its employees.

262)   The Plaintiff and Defendant entered into the MGMT 169 CONTRACT and the JANUARY 2023 CONTRACT based on Defendant's representations.

263)   The Defendant represented that the head of the Price Center and/or the DIRECTOR of the UME were empowered to obligate Defendant and were capable of making agreements Plaintiff.

264)   Plaintiff reasonably relied on Defendant's representations.

265)   Those two people then made representations to contract on behalf of the Defendant, knowingly misleading Plaintiff to comply which accrued benefit to each of them to enhance their own job performance.

266)   The alternative fact (not included in other counts) is that the Defendant and its employees knew the representations were false when it made them.

267)   The Defendant and its employees intended that Plaintiff be induced to rely on the false representations which he did.

268)   The Plaintiff was harmed by his reliance on the false representations.

269)   As a direct and proximate result of Defendant's and employees' unlawful conduct, Plaintiff has suffered damages as alleged.

### SEVENTH CAUSE OF ACTION, in the Alternative

(Misrepresentation Leading To Loss of Social Service *in the alternative*)

270)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs (not including the SIXTH Cause Of Action) as fully set forth herein except for those that the Defendant's employees were authorized to enter into a contract with Plaintiff.

271)   Defendant made false representations of material facts through its authorized representatives.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

272)   Defendant knew they were false and intended to induce reliance by Plaintiff.

273)   Plaintiff reasonably relied on the false claims resulting in damage outside of redressable (and immune) financial damages.

274)   Defendant is in the 'business' of providing a social service with societal benefit – education as a public university.

275)   Plaintiff was the Defendants' top entrepreneurship faculty.

276)   The loss of his ability to work with students is a loss to the community, particularly the student community.

277)   The replacement provider of services did not provide them to the same level, nor could they, leading to a societal loss.

278)   The "Don't Poach Coach" Protest movement led by the student body president shows the incredible social service provided by having (and losing) Plaintiff.

279)   Plaintiff's ability to teach to the student body is a social service for which financial compensation cannot be made and is a social service for the people of California.

280)   The loss of the social service is a loss to the public welfare given Plaintiff's memorialized successes. While students gathered to protest a year later to stop education, the students rallied and marched for the Plaintiff, en masse.

281)   The loss is a significant disruption to the provision of a social service including both an education to the students and the Plaintiff's ability to fulfill his role providing it.

282)   The ability to teach and provide for the best interests of the students is not a commercial transaction, but a calling, and a social service not subject to immunity.

283)   Therefore, an order should be entered against Defendant for Misrepresentation.

**EIGHTH CAUSE OF ACTION, in the Alternative**

(Equitable Estoppel *in the alternative*)

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

284)   Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs through the Fifth Cause of Action as though fully set forth herein.

285)   Defendant Regents of the University of California ("Regents"), a public corporation under Article IX, Section 9 of the California Constitution, has authority to contract and hire personnel (Cal. Const., Art. IX, §9; Educ. Code §92436).

286)   On or about 2018, the Defendant represented to Plaintiff that he would continue teaching MGMT 169 as long as it was offered, whether under a CBA-controlled APPOINTMENT, as an adjunct faculty member, or otherwise, if Plaintiff developed a hybrid syllabus reducing faculty costs (MGMT 169 CONTRACT. These representations were corroborated by writings, including course assignments, and My UCLA system listings (Exhibit A).

287)   On or about Fall 2022, the Defendant, through the DIRECTOR of the UME, represented that Plaintiff would continue to teach his regular course load plus one more class to be considered "full time," including Social Entrepreneurship in Winter 2023 and going forward, outside any CBA-controlled APPOINTMENT, if Plaintiff rewrote the Social Entrepreneurship syllabus and adjusted his schedule (JANUARY 2023 CONTRACT). These representations were reduced to writings in the My UCLA system (Exhibit A) and course listings.

288)   The Defendant intended, or reasonably should have known, that Plaintiff would rely on these representations, which were specific, consistent, and within their constitutional authority to make.

289)   Plaintiff reasonably relied on the Regents' representations by:

    a.   Developing the MGMT 169 hybrid syllabus, reducing UME faculty costs by 80% (approximately $250,000 annually);

    b.   Rewriting the Social Entrepreneurship syllabus, creating frameworks (e.g., MIAM-B, Socialyzer.org), and producing videos;

    c.   Adjusting his schedule, forgoing job opportunities, hiring TAs, and reviewing student applications for Spring 2023;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

    d. Continuing to teach post-termination (February 28, 2023) through April 3, 2023, without benefits or full technology access.

290) Plaintiff's reliance was reasonable given the Defendants' authority, the corroborating writings which required significant inter-departmental coordination (Exhibit A), and their course assignments through Spring 2024 which were intended to extend further when a new academic year's classes were uploaded.

291) As a direct result of Plaintiff's reliance, the Defendant failed to honor its representations by terminating Plaintiff's employment on February 28, 2023, denying him the opportunity to teach MGMT 169 and other promised courses, and removing his benefits and technology access. Denying enforcement of the Defendant's representations would cause unconscionable injury to Plaintiff, who suffered lost income, reputational harm, and emotional distress. Enforcement would not unduly harm the public welfare, as it aligns with the Defendant's mission to fairly manage the University and provide top tier education.

292) Plaintiff seeks equitable relief, including an order estopping the Defendant from denying its promises to allow Plaintiff to teach MGMT 169 so long as it is taught, and to keep teaching his regular courseload, reinstatement as Continuing Lecturer or Adjunct Faculty, and/or damages for reliance losses.

**NINTH CAUSE OF ACTION, *in the alternative***

(Unjust Enrichment In the Alternative)

293) Plaintiff re-alleges and incorporates by reference the allegations in all prior paragraphs as fully set forth herein other than any paragraph which alleges the parties entered into the MGMT 169 CONTRACT, its UNILATERAL MODIFICATION, or the JANUARY 2023 CONTRACT.

294) This count is in the alternative to all other counts should there by no other method of recovery.

295) Defendant made significant wrongful gains, outside of a contract as a result of false representations made to Plaintiff, bad faith, and other acts which Defendant

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

reduced to writing by listing Plaintiff in the My UCLA system out through Spring 2024 among other writings.

296)   Defendant's actions herein were wrongful by falsely representing to Plaintiff the existence of contracts and future promises of allowing him to teach at UCLA in exchange for his valuable services.

297)   Defendant's gains were at Plaintiff's expense, without contract, and would be unjust to allow the Defendant to keep those gains without compensating Plaintiff.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court grant the following relief:

A. For a judgment in favor of Plaintiff and against Defendant on all causes of action alleged herein;

B. For compensatory damages, including but not limited to lost wages, benefits, and other remuneration, according to proof of an amount greater than $75,000;

C. For general damages for emotional distress, reputational harm, and mental anguish, according to proof;

D. For punitive damages where permitted by law, in an amount sufficient to punish and deter Defendant's wrongful conduct;

E. To name Plaintiff "Continuing Lecturer" or in the alternative Adjunct Faculty during the remaining period of the UME's existence or a like replacement teaching Entrepreneurship, Law, Strategy, or Social Entrepreneurship to Undergraduate or Business School students;

F. To allow Plaintiff to continue to participate in the provision of a social service of education in the student's best interests to the people of California by having him continue to teach at UCLA;

G.  For attorney's fees and costs of suit incurred herein pursuant to 42 U.S.C. § 2000e-5(k) and Cal. Gov't Code § 12965(b), and other good law;

H. For pre-judgment and post-judgment interest as permitted by law;

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

I.  For such other and further legal and equitable relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

1st day of May, 2025

/s/Edward "Coach" Weinhaus/s/

EDWARD "COACH" WEINHAUS
Plaintiff in *Pro Per*

**CERTIFICATE OF SERVICE**

I, Edward "Coach" Weinhaus, caused the above document to be served to Defendants via the efiling system on today's date.

/s/Edward "Coach" Weinhaus/s/

EDWARD "COACH" WEINHAUS
Plaintiff in *Pro Per*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF