SANDRA L. McDONOUGH (SBN 193308)
sandy.mcdonough@quarles.com
MATTHEW W. BURRIS (SBN 325569)
matt.burris@quarles.com
LUCY J. PERITZ (SBN 356324)
lucy.peritz@quarles.com
**QUARLES & BRADY LLP**
101 West Broadway, Suite 1500
San Diego, California 92101
Telephone: 619-237-5200
Facsimile: 619-615-0700

Attorneys for THE REGENTS OF THE
UNIVERSITY OF CALIFORNIA

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD "COACH" WEINHAUS,<br><br>Plaintiff,<br><br>v.<br><br>REGENTS OF THE UNIVERSITY OF CALIFORNIA,<br><br>Defendant. | Case No. 2:25-cv-00262 JFW (ASx)<br><br>**DEFENDANT THE REGENTS OF THE UNIVERSITY OF CALIFORNIA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>Date:      June 15, 2026<br>Time:     1:30 p.m.<br><br>Judge:          Hon. John F. Walter<br>Mag. Judge:  Hon. Alka Sagar<br>Crtrm.:          7A<br>Trial Date:     September 15, 2026 |

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................... 1

II.   STATEMENT OF FACTS .............................................................................. 2

A.    Weinhaus' Employment at UCLA Anderson .......................................... 2

B.    After 18 Quarters, Lecturers Are Assessed in an "Up-or-Out" Excellence Review Process to Determine Whether They Will Be Promoted to Continuing Lecturer ................................................................ 3

1.    Student Evaluations Raise Concerns about Weinhaus' Teaching ........................................................................................ 4

2.    One Student Reviewer Noted that Weinhaus Referred to Himself as the "Hardest Drinking Jew in Chicago" ..................... 5

3.    Evaluations from Colleagues Also Reveal Concerns About Weinhaus' Teaching Rigor ........................................................... 6

4.    A Three-Person Ad Hoc Committee Initially Recommends Weinhaus' Appointment to Continuing Lecturer ........................ 6

5.    The Five-Member Staffing Committee Votes 4-1 in Favor of Weinhaus' Appointment to Continuing Lecturer ..................... 7

6.    The Department Does Not Recommend Weinhaus' Appointment to Continuing Lecturer, with 34 of 45 Faculty Voting "No" ..................................................................... 8

C.    Dean Bernardo Adopts the Department's Recommendation Not to Appoint Weinhaus to a Continuing Lecturer Position ...................... 8

D.    After Learning of the Department's Resounding "No" Vote, Weinhaus Claims He Had Previously Formed Two Oral Contracts with The Regents Allowing Him to Teach At UCLA Indefinitely ............................................................................................. 9

E.    Weinhaus Initiates the Union Grievance Process ................................. 10

1.    UCLA Dismisses Weinhaus' Grievance as Untimely and Unsubstantiated .......................................................................... 10

2.    UCLA Dismisses Weinhaus' Grievance at Step 2 ..................... 11

3.    Weinhaus and the Union Choose Not to Appeal Weinhaus' Grievance ................................................................. 12

F.    Weinhaus Files a Complaint with the CRD and EEOC ....................... 12

i

III.  LEGAL STANDARD ....................................................................................... 12

IV.  ARGUMENT .................................................................................................. 13

    A.  Weinhaus' Discrimination Claims Fail .......................................... 13

        1.  Weinhaus' Title VII Claims Are Untimely ............................. 13

        2.  Both the Title VII and FEHA Claims Fail on The Merits ......... 14

            a.  Weinhaus Cannot Establish a *Prima Facie* Case of Discrimination ...................................................... 14

            b.  UCLA Had a Legitimate Non-Discriminatory Reason for Not Appointing Weinhaus to a Continuing Lecturer Position ........................................... 16

    B.  Weinhaus' Contract Claims Fail ...................................................... 17

        1.  Weinhaus' Failed to Exhaust his Contractual Remedies ........... 17

        2.  Weinhaus' Breach of Oral Contract Claim Fails ..................... 18

            a.  Weinhaus' Alleged Employment Outside the CBA Was Governed by Statute, not Contract .......................... 18

            b.  Interim Dean Osborne and Director Wilson Did Not Have Authority to Enter Into a Contract on Behalf of The Regents .................................................... 19

            c.  Parol Evidence Rule Bars Alleged Contracts ................... 20

            d.  Statute of Frauds Renders Alleged Contracts Unenforceable ...................................................... 21

        3.  Weinhaus' Unjust Enrichment Claim Fails ............................. 22

        4.  Weinhaus' Promissory Estoppel Claim Fails ........................... 22

V.  CONCLUSION ................................................................................................ 24

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242 (1986)............................................................................................13

*Arpin v. Santa Clara Valley Transp. Agency*
261 F.3d 912 (9th Cir. 2001) ...........................................................................13

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986)............................................................................................12

*Cleveland v. Douglas Aircraft Co.*
509 F.2d 1027 (9th Cir. 1975) ....................................................................13, 14

*Doe v. Regents of Univ. of Cal.*
672 F.Supp.3d 813 (N.D. Cal. 2023).................................................................22

*Doyle v. CT Corp. Sys.*
2012 WL 161355 (N.D. Cal. Jan. 18, 2012).....................................................17

*Faro v. N.Y. Univ.*
502 F.2d 1229 (2d Cir. 1974) ...........................................................................15

*Hittle v. City of Stockton*
101 F.4th 1000 (9th Cir. 2024) .........................................................................16

*Jennings v. Victor Valley Cmty. Coll. Dist.*
2016 WL 2586113 (C.D. Cal. May 2, 2016)......................................................14

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574 (1986)............................................................................................12

*McDonnell Douglas Corp. v. Green*
411 U.S. 792 (1973)............................................................................................14

*Nelson v. Pima Cmty. Coll.*
83 F.3d 1075 (9th Cir. 1996) .............................................................................13

iii

*Regents of Univ. of Mich. v. Ewing*
  474 U.S. 214 (1985)................................................................................15

*Sateriale v. R.J. Reynolds Tobacco Co.*
  697 F.3d 777 (9th Cir. 2012) ...................................................................22

*Scholar v. Pac. Bell*
  963 F.2d 264 (9th Cir. 1992) ...................................................................13

**State Cases**

*Colome v. State Athletic Comm'n of Cal.*
  47 Cal.App.4th 1444 (1996).....................................................................22

*De Vries v. Regents of Univ. of Cal.*
  6 Cal.App.5th 574 (2016) .........................................................................18

*Farahani v. San Diego Cmty. Coll. Dist.*
  175 Cal.App.4th 1486 (2009) ...................................................................17

*G.L. Mezzetta, Inc. v. City of American Canyon*
  78 Cal.App.4th 1087 (2000) .....................................................................19

*Granadino v. Wells Fargo Bank, N.A.*
  236 Cal.App.4th 411 (2015) .....................................................................22

*Grasko v. L.A. City Bd. of Educ.*
  31 Cal.App.3d 290 (1973) ........................................................................18

*Guz v. Bechtel Nat'l, Inc.*
  24 Cal.4th 317 (2000) ...............................................................................14

*Hill v. City of Long Beach*
  33 Cal.App.4th 1684 (1995) .....................................................................19

*Horn v. Cushman & Wakefield W., Inc.*
  72 Cal.App.4th 798 (1999) .......................................................................17

*Janis v. Cal. State Lottery Com.*
  68 Cal.App.4th 824 (1998) .......................................................................22

iv

*Johnson v. Hydraulic Rsch. & Mfg. Co.*
  70 Cal.App.3d 675 (1977) ...............................................................................17

*Katsura v. City of San Buenaventura*
  155 Cal.App.4th 104 (2007) ...............................................................19, 20, 22

*Marani v. Jackson*
  183 Cal.App.3d 695 (1986) ...............................................................................20

*Pasadena Live v. City of Pasadena*
  114 Cal.App.4th 1089 (2004) ............................................................................22

*Ponte v. County of Calaveras*
  14 Cal.App.5th 551 (2017) ................................................................................23

*Poway Royal Mobilehome Owners Ass'n v. City of Poway*
  149 Cal.App.4th 1460 (2007) ............................................................................23

*Retired Emps. Ass'n of Orange Cnty. v. County of Orange*
  52 Cal.4th 1171 (2011) .....................................................................................18

*Richman v. Hartley*
  224 Cal.App.4th 1182 (2014) ............................................................................18

*Serv. Emps. Int'l. Union, Loc. 1000 v. Dep't of Personnel Admin.*
  142 Cal.App.4th 866 (2006) ..............................................................................17

*Slivinsky v. Watkins-Johnson Co.*
  221 Cal.App.3d 799 (1990) ...............................................................................21

*White v. Davis*
  30 Cal.4th 528 (2003) ...................................................................................19, 20

**Federal Statutes**

42 U.S.C. § 2000e-5(e)(1) .................................................................................13

42 U.S.C. § 2000e-5(f)(1) .................................................................................13

v

**State Statutes**

Cal. Const., art. IX, § 9 .................................................................................18

Cal. Civ. Code § 1624(a)(1) .........................................................................21

Cal. Civ. Proc. Code § 1856(a).....................................................................20

Cal. Gov't Code § 811.2 ...............................................................................18

Cal. Gov't Code § 815(a)..............................................................................22

Cal. Gov't Code § 818.8 ...............................................................................22

Cal. Gov't Code § 3505 ................................................................................18

Cal. Gov't Code § 3505.1 .............................................................................18

**Federal Rules**

Fed. R. Civ. P. 56(a) .....................................................................................12

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

## I.   INTRODUCTION

Plaintiff Edward Weinhaus ("Weinhaus") was a non-tenured lecturer ("Lecturer") at the University of California, Los Angeles Anderson School of Management[1] ("UCLA Anderson").  As with all Lecturers, his employment was governed by a Collective Bargaining Agreement ("CBA") between The Regents and the University Council – American Federation of Teachers, Local 1990 ("UC-AFT" or "Union"), of which Weinhaus was a member.  In 2022, Weinhaus was under consideration for a promotion to Continuing Lecturer.  Per the CBA, after six years or 18 quarters, Lecturers face an "up-or-out" evaluation, called an Excellence Review, where they are either promoted to Continuing Lecturer, which includes a salary increase, or they are denied continued appointment as an instructor with UCLA.  Following an extensive faculty review of Weinhaus' qualifications, teaching record, student evaluations, and peer recommendations, 34 out of 45 (or 76%) of voting faculty members concluded his teaching did not meet the standard of "excellence" required for continued appointment at UCLA.  The faculty concluded that Weinhaus should not be promoted from Lecturer to Continuing Lecturer because Weinhaus' courses lacked rigor, his classes were disorganized, he demonstrated an inability to communicate clearly or professionally with students inside and outside of the classroom, and he exhibited an unprofessional demeanor in his interactions with students.  Weinhaus claims that the faculty's decision not to promote him to Continuing Lecturer was because of his Jewish identity.  But the only support that Weinhaus provides for this claim is that one student wrote in a review of his course that Weinhaus described himself in class as the "hardest drinking Jew in Chicago," which Weinhaus does not deny.  The student stated that they noted Weinhaus' comment to provide an example of the "sheer ridiculous

---

[1] Defendant The Regents of the University of California ("The Regents") is the governing body of the University of California, including the UCLA campus.

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

nature" of Weinhaus' course.  Weinhaus does not allege that anyone else at UCLA commented on his Jewish identity, much less made a disparaging comment.

Weinhaus also claims The Regents breached two alleged oral contracts regarding his continued employment.  These contract claims are both procedurally improper and substantively unsupported because Weinhaus cannot establish the existence of a valid oral contract with The Regents.  Accordingly, The Regents respectfully requests the Court grant its motion for summary judgment or, in the alternative, partial summary judgment.

## II.    STATEMENT OF FACTS

### A.    Weinhaus' Employment at UCLA Anderson

Weinhaus began work at UCLA Anderson in the fall of 2016 as a Lecturer, a non-tenured instructor position.  (Statement of Uncontroverted Facts ("SUF") at 1.) Weinhaus was a union member of the University Council – American Federation of Teachers, Local 1990 ("UC-AFT" or "Union") in the Non-Senate Faculty Unit 18 bargaining unit ("Unit 18 faculty").  (SUF at 2.)  Unit 18 faculty appointments have definite beginning and ending dates, typically for one to three academic years. (SUF at 3.)  Weinhaus' employment at UCLA was governed by the CBA.  (SUF at 4.)

At UCLA, Weinhaus taught several different courses in the Undergraduate Minor in Entrepreneurship ("UME") program, including "MGMT 169: Entrepreneurial Leadership and Practical Experience," a capstone course for the UME program.  (SUF at 5.)  Weinhaus took deliberate steps to attempt to obtain high student ratings by making his class easier for students, including promising students he would give them the highest grades the university would allow, telling students he did not care if they did their homework, and offering flexibility on attendance.  (SUF at 6.)  He also asked students in every class what he needed to do to earn their highest evaluation comments and scores.  (SUF at 7.)

/ / /

2

**B.** **After 18 Quarters, Lecturers Are Assessed in an "Up-or-Out" Excellence Review Process to Determine Whether They Will Be Promoted to Continuing Lecturer**

For Unit 18 faculty, after 18 academic-year quarters (or six years of academic quarters), UCLA conducts an Excellence Review to evaluate whether the Lecturer should become a Continuing Lecturer. (SUF at 8.) Faculty under consideration for continuing appointment are assessed on the basis of demonstrated excellence in teaching, academic responsibility, and other assigned duties. (SUF at 9.) Instructional performance is evaluated based on several factors, including organizing and presenting course content effectively and with demonstrated learning outcomes; setting pedagogical objectives appropriate to the course topic, level, and format; developing pedagogically effective assignments, lecture slides, lesson plans, exams, and/or other course materials. (SUF at 10.) Reappointment in the quarters or academic years leading up to the Excellence Review is not an indicator that a Lecturer will meet with the Excellence Review standards. (SUF at 11.)

Weinhaus entered his 18th quarter of lecturing in Fall 2022. (SUF at 15.) On May 3, 2022, Faculty Chairman Sanjay Sood ("Chair Sood") sent a letter to Weinhaus providing notice of the timing of his Excellence Review and a list of documents to submit. (SUF at 12.) The letter extended to Weinhaus the opportunity to ask questions about the review process. (SUF at 13.) Weinhaus acknowledged this letter on May 9, 2022. (SUF at 14.)

Under narrow circumstances, UCLA sometimes employs a Lecturer who is in the process of their Excellence Review for a 19th quarter if their review has not been completed. (SUF at 16.) This ensures that there are no interruptions to the Lecturers' pay or benefits while the review is ongoing. (SUF at 17.) A Lecturer under consideration for Continuing Lecturer receives no guarantee of re-appointment for the next quarter or promotion to Continuing Lecturer, even if he is working in the 19th quarter. (SUF at 18.) On October 27, 2022, Chair Sood sought

3

an exception from UCLA's Academic Personnel Office for Weinhaus to teach a 19th quarter while his Excellence Review was ongoing.  (SUF at 19.)  The exception was granted, and on October 28, 2022, Weinhaus was offered a teaching assignment for Winter quarter of Academic Year 2022-23, which was his 19th quarter.  (SUF at 20.)  Weinhaus' Excellence Review concluded in February 2023, and thus spanned both his 18th and 19th quarters.  (SUF at 21.)

### 1.   Student Evaluations Raise Concerns about Weinhaus' Teaching

When conducting an Excellence Review, the Academic Personnel Office ("APO") works with the Lecturer to compile the dossier to be reviewed.  (SUF at 22.)  This dossier includes the Lecturer's resume, teaching records, student course evaluations, letters from student reviewers, and peer recommendations.  (SUF at 23.)

Weinhaus' dossier included course evaluations from students enrolled in each of his classes over the course of his employment at UCLA.  (SUF at 24.)  While some student evaluations complimented Weinhaus' unconventional teaching style, other students criticized his classroom demeanor and effectiveness:

- "…the lessons were not always well organized – we would often discuss material which did not directly pertain to the content on the syllabus."

- "…often times the professor was quick to shut down other students opinions for a chance to prove them wrong."

- "I did not feel that Coach provided intellectually stimulating material and presented some unfavorable qualities amongst students - namely, students not feeling comfortable seeking help outside of the classroom, while also putting down and shamefully targeting students in a 19 person class."

- "I wish the learning environment was less hostile and more welcoming."

- "[P]rofessor is arrogant and extremely unprofessional."

- "…seemed to be using the teaching experience to boost his own ego."

- "Right from the start, it was evidence that the course material was not

4

organized or comprehensive. 'Coach' Weinhaus did not seem invested in our learning as much as he did boosting his list of accomplishments by teaching this class."

(SUF at 25–31.)  Further, several students remarked on Weinhaus' concerning behavior toward students:

- "… 'Coach' was disrespectful to students trying to participate and at times felt misogynistic. felt like he expected us to have a prior knowledge of law that many of us didn't have, and he criticized us for not having that knowledge or anytime that we were wrong-- often times cutting students off mid-sentence to tell them they were wrong. I don't feel this created a welcoming learning environment at all, and I personally felt unsupported in trying to participate."

- "His attitude towards students was honestly disrespectful. He should be more careful with his words because sometimes he would sound racially discriminating even if that is not what he meant."

- "Coach referred to the few people of color in the room when discussing how not everyone subscribes to Western culture. I was uncomfortable, but I wanted to believe that I had simply gotten a bad first impression."

(SUF at 32–34.)

### 2. One Student Reviewer Noted that Weinhaus Referred to Himself as the "Hardest Drinking Jew in Chicago"

In addition to student course evaluations, the APO solicits letter reviews from students as part of the Excellence Review.  (SUF at 35.)  These evaluations are solicited randomly and students remain anonymous.  (SUF at 36.)  Consistent with this practice, UCLA emailed a cohort of Weinhaus' former students to request confidential  reviews of his teaching, and 11 former students submitted letters. (SUF at 37.)

In a response letter dated June 14, 2022, Student Reviewer #10 resoundingly encouraged UCLA Anderson not to appoint Weinhaus to a Continuing Lecturer position.  The student commented that Weinhaus:

[M]ade everyone call him 'coach' . . . and referred to himself frequently as "the hardest drinking Jew in Chicago." He also taught every lesson about integrity or morality through Old Testament examples and expected us to apply . . . biblical stories to our internship experiences. His class was entertaining for the sheer ridiculous nature of it, but it took hours of lecture time that added no value . . . please do not force future students to sit through Edward Weinhaus' class.

5

(SUF at 38.)  Weinhaus testified that he did refer to himself as "the hardest drinking Jew in Chicago" in class.  (SUF at 39.)  Though Student Reviewer #10 was the only respondent to expressly advise against appointment, others nonetheless raised criticisms of Weinhaus' classroom demeanor.  For example, Student Reviewer #3 tempered her support of Weinhaus' appointment by noting:

> Coach has a notoriously brash, no-nonsense attitude that is definitely something to acclimate to and can be taken as ill-mannered, crass or offensive. Frequently, I felt that his impatience and retorts were entirely unwarranted and discouraged students from asking for help when needed. Additionally, his email etiquette was often atrocious and often entirely unhelpful. For example, reasonable questions that could be answered with a simple yes or no would often be responded to with scolding or snarky comebacks that avoided answering the question entirely.

(SUF at 40.)

### 3.    Evaluations from Colleagues Also Reveal Concerns About Weinhaus' Teaching Rigor

Evaluations from Weinhaus' colleagues were also included in the review process.  Even those colleagues who ultimately recommended Weinhaus for appointment to Continuing Lecturer raised concerns with his teaching, particularly about his demeanor and that his classes lacked rigor.  As one example:

> First, his classes aren't as rigorous or challenging as claimed. I would say that his courses require somewhere between average or below average levels of work.  For example, when he teaches MGMT 169 he lets students replace through various optional "extra credit" 3 of 6 required assignments.  This means that a student could do half the "required" homework as defined in the syllabus approved by the department and still receive an A. . . . Historically, Prof. Weinhaus has given almost no grades below a B- so even the students that don't do all the required work appear still appear to be able to get into at least the "B" range.

(SUF at 41.)

### 4.    A Three-Person Ad Hoc Committee Initially Recommends Weinhaus' Appointment to Continuing Lecturer

The Ad Hoc Committee is a three-person committee made up of members of the Department of Management at UCLA Anderson ("Department"), appointed by

6

Chair Sood, in consultation with the Staffing Committee, which is a five-member elected committee of tenured faculty in the Department who advise the Chair on all academic personnel matters.  (SUF at 42.)  The Ad Hoc Committee conducts the first stage of the Excellence Review; they review the Lecturer's dossier, meet to discuss, and conduct a vote.  (SUF at 43.)

On October 7, 2022, the Ad Hoc Committee decided that Weinhaus' teaching met the excellence standard for an appointment to Continuing Lecturer.  (SUF at 44.)  However, their assessment noted Weinhaus had a "unique teaching style," citing a student who was told "there would be no midterms or finals, not even homework due."  (SUF at 45.)  Their assessment acknowledged Weinhaus' negative reviews, including several comments about the unstructured nature of the course, lack of rigor, and Weinhaus' disrespectful attitude toward students, as well as Student Reviewer #10's concerns.  (SUF at 46.)

### 5. The Five-Member Staffing Committee Votes 4-1 in Favor of Weinhaus' Appointment to Continuing Lecturer

The Ad Hoc Committee's report was then included with Weinhaus' dossier, and reviewed by the Staffing Committee.  (SUF at 47.)  On November 18, 2022, the Staffing Committee met to discuss Weinhaus' appointment.  (SUF at 48.)  It recognized the strong positive recommendation from the Ad Hoc Committee, and that of the Director of the UME program, Nathan Wilson ("Director Wilson").  (SUF at 49.)  The Staffing Committee noted that Weinhaus' instructor ratings were positive and were improving over time, and that Weinhaus took feedback well.  (SUF at 50.)  Though it also noted that Weinhaus' classes appeared to lack rigor, it ultimately voted 4 Yes and 1 No in favor of Weinhaus' appointment to Continuing Lecturer.  (SUF at 51.)

/ / /

/ / /

/ / /

7

**6.      The Department Does Not Recommend Weinhaus'**
**Appointment to Continuing Lecturer, with 34 of 45 Faculty**
**Voting "No"**

The next level of Weinhaus' review was at the Department level, consisting of a review and vote by 45 eligible tenured faculty on December 2, 2022.  (SUF at 52.)  The Department review began with an overview of Weinhaus' background and a brief summary of the prior assessments by the Ad Hoc and Staffing committees.  (SUF at 53.)  Afterwards, numerous faculty participated in an open discussion of Weinhaus' dossier and qualifications.  (SUF at 54.)  Overall, the tone of the discussion generally ranged from somewhat concerned to highly critical of Weinhaus.  (SUF at 55.)  The Department ultimately voted against Weinhaus' appointment, with 34 faculty members voting "No," 9 voting "Yes," and 2 abstaining, for approximately 76% (34/45) voting against Weinhaus' continuing appointment.  (SUF at 56.)

On December 13, 2022, Chair Sood emailed Weinhaus to let him know that the Department voted against appointing him to a Continuing Lecturer position.  (SUF at 57.)  Later that day, Weinhaus sent Al Osborne (UCLA Anderson's then-interim Dean) ("Interim Dean Osborne") an email with the subject line "strong no vote on my appointment" and told Interim Dean Osborne, "It looks like my days teaching may be over."  (SUF at 58.)  On December 15, 2022, Chair Sood sent a memorandum to the then-Dean of UCLA Anderson, Antonio Bernardo ("Dean Bernardo"), summarizing the Department meeting and recommendation.  (SUF at 59.)  On January 9, 2023, Weinhaus submitted a response to Chair Sood's memo to Dean Bernardo.  (SUF at 60.)

**C.      Dean Bernardo Adopts the Department's Recommendation Not to**
**Appoint Weinhaus to a Continuing Lecturer Position**

On February 16, 2023, Dean Bernardo adopted the Department's recommendation as the final decision in Weinhaus' Excellence Review, and noted in

8

a memo to Michael Levine, the Vice Chancellor for Academic Personnel:

> In sum, Mr. Weinhaus' teaching record has clear strengths, but concerns about the rigor of his courses, his professionalism and the learning environment in the classroom, and his failure to address these concerns, are important and valid. Taken together, these factors indicate that Mr. Weinhaus does not meet the high standard of "excellence" required for an appointment to Initial Continuing Lecturer; I do not find a compelling reason to disagree with the department's recommendation against the appointment.

(SUF at 61.)  Dean Bernardo's memo did not mention Student Reviewer #10, or Weinhaus' statements that he was the "hardest drinking Jew in Chicago."  (SUF at 63.)  However, Dean Bernardo's memo did reference Student Reviewer #3's concern that Weinhaus had a "notoriously brash, no-nonsense attitude that . . . can be taken as ill-mannered, crass, or offensive," and that "his impatience and retorts were entirely unwarranted and discouraged students from asking for help when needed."  (SUF at 64.)  Dean Bernardo was the final decisionmaker on Weinhaus' Excellence Review; each level of review prior to his provided recommendations only.  (SUF at 62.)

> **D.      After Learning of the Department's Resounding "No" Vote, Weinhaus Claims He Had Previously Formed Two Oral Contracts with The Regents Allowing Him to Teach At UCLA Indefinitely**

After he learned that he would not be reappointed to a Continuing Lecturer position, and after acknowledging it looked like his teaching days at UCLA were accordingly over, Weinhaus alleged he entered into two oral contracts with The Regents that allowed him to teach at UCLA indefinitely.

In 2023, Weinhaus claimed for the first time that he formed a contract in 2018 ("MGMT 169 Contract") with The Regents through a conversation with Interim Dean Osborne.  (SUF at 65.)  Weinhaus claims the MGMT 169 Contract entitled him to: (1) create a first draft of a syllabus for a hybrid version of the MGMT 169 class; (2) teach this hybrid class, should Interim Dean Osborne find his teaching skills satisfactory upon personal observation; and (3) teach this course as long as it

9

was offered, regardless of any CBA appointment.  (SUF at 66.)

But Weinhaus did not stop there.  He also claimed Director Wilson entered into another oral contract on behalf of UCLA in January 2023 ("January 2023 Contract").  (SUF at 67.)  Weinhaus claims the January 2023 Contract included the following terms: (1) Weinhaus would re-write the Social Entrepreneurship course syllabus; (2) UCLA would uphold the previous MGMT 169 contract; (3) Weinhaus would receive 5 (rather than 4) courses for the 2022-23 academic year; (4) Weinhaus' employment would include future courses in Spring 2023 and academic year 2023-24 and forward; (5) Weinhaus would be promoted to Adjunct Faculty (despite having just been rejected for an appointment to Continuing Lecturer); and (6) Weinhaus would receive all the regular employment benefits of an adjunct faculty member.  (SUF at 68.)[2]  Weinhaus testified Director Wilson might not have known Weinhaus would not pass the Excellence Review at the time of the alleged conversation about teaching future courses.  (SUF at 69.)

**E.    Weinhaus Initiates the Union Grievance Process**

**1.    UCLA Dismisses Weinhaus' Grievance as Untimely and Unsubstantiated**

On March 20, 2023, pursuant to the CBA, UC-AFT filed a grievance on Weinhaus' behalf, which alleged: (1) that Weinhaus was improperly released from employment; (2) UCLA Anderson failed to complete its Excellence Review of Weinhaus in a timely and proper fashion; (3) UCLA Anderson improperly held Weinhaus to a higher standard in order to deny his appointment; and (4) several additional contractual violations.  (SUF at 70.)

/ / /

---

[2] At deposition, Weinhaus testified that he could not remember the exact details of the alleged contract, but the details were "whatever I wrote in my complaint."  (SUF at 68.)

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

The Union and Weinhaus requested a variety of remedies, including a referral of two of his grievances to the UCLA Academic Senate and the Discrimination Prevention Office ("DPO"). (SUF at 71.) UCLA referred Weinhaus' claim of a violation of his academic freedom to the UCLA Academic Senate. (SUF at 72.) And, UCLA referred his claim of religious discrimination to the DPO. (SUF at 73.) On April 26, 2023, the Academic Senate's Committee on Privilege and Tenure issued a report finding that there was no *prima facie* case that Weinhaus' academic freedom was violated, and on August 22, 2023, the DPO elected not to proceed with a formal investigation because there was insufficient evidence that the negative treatment alleged was because of Weinhaus' religion or ancestry. (SUF at 74, 75.)

After the Academic Senate issued a response and the Discrimination Prevention office chose not to proceed with a formal investigation and closed the matter, per CBA procedure, Weinhaus' grievance proceeded to a Step 1 meeting, which was held on September 21, 2023. (SUF at 76.) UCLA subsequently issued a response to Weinhaus' grievance in a letter dated October 19, 2023 ("Step 1 Response"). (SUF at 77.) The Step 1 Response denied Weinhaus' claims in their entirety and further noted that his grievance was ineligible for further processing since it was filed late. (SUF at 78.) The CBA stipulates that grievances must be filed within 30 days of when the faculty member or the Union "knew or could have been expected to know of the event or action which gave rise to the grievance." (SUF at 79.) As the grievance was filed 32 days after February 16, 2023, it was untimely.

### 2. UCLA Dismisses Weinhaus' Grievance at Step 2

Following the Step 1 response, Weinhaus and his Union requested a Step 2 meeting to discuss the merits of his grievance. The Step 2 meeting was held on December 8 and December 14, 2023. (SUF at 80.) UCLA then issued its Step 2 response to Weinhaus' grievance on February 6, 2024 ("Step 2 Response"), which addressed both the substantive and procedural deficiencies of Weinhaus' grievances.

11

(SUF at 81.)  On March 4, 2024, the University of California Office of the President ("UCOP") issued a Step 3 written response to Weinhaus' grievances ("Step 3 Response"), which again addressed both the untimeliness and substantive issues with Weinhaus' grievance.  (SUF at 82.)

### 3.    Weinhaus and the Union Choose Not to Appeal Weinhaus' Grievance

Weinhaus' Union had until April 11, 2024 to appeal the Step 3 Response to arbitration.  (SUF at 83.)  However, neither Weinhaus nor his Union appealed the grievance.  (SUF at 84.)  On April 22, 2024, the Union officially withdrew the grievance, and on May 10, 2024, UCLA notified the Union that the matter was officially closed.  (SUF at 85.)

### F.    Weinhaus Files a Complaint with the CRD and EEOC

Weinhaus filed a complaint through the California Civil Rights Department ("CRD") on December 14, 2023, which was deemed dual-filed with the Equal Employment Opportunity Commission ("EEOC").  (SUF at 86.)  On August 15, 2024, the EEOC issued a right to sue notice to Weinhaus, explaining that the facts alleged failed to state a claim, and advising Weinhaus that he had 90 days to file a lawsuit.  (SUF at 87.)  According to Weinhaus, on October 15, 2024, the EEOC issued him a second right to sue notice.  (SUF at 88.)

## III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A party seeking summary judgment bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Then, the burden shifts to the opposing party to present specific facts demonstrating a genuine issue of a material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  Conclusory statements based merely on conjecture,

12

speculation, or subjective belief do not constitute competent summary judgment evidence. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001); *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996). A motion for summary judgment cannot be defeated by "evidence that is merely colorable" or "is not significantly probative." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## IV. ARGUMENT

### A. Weinhaus' Discrimination Claims Fail

#### 1. Weinhaus' Title VII Claims Are Untimely

Before filing a Title VII claim, a plaintiff must first file a claim for discrimination with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the adverse employment action. 42 U.S.C. § 2000e-5(e)(1). If the EEOC dismisses the charge, a plaintiff must file a civil complaint within 90 days of the right to sue notice. 42 U.S.C. § 2000e-5(f)(1). Failure to file a civil complaint within the 90-day period results in a bar of that claim. *Scholar v. Pac. Bell*, 963 F.2d 264, 267 (9th Cir. 1992).

Weinhaus received the EEOC's right to sue notice on August 8, 2024. (SUF at 87.) He had until November 16, 2024, to file his complaint in civil court. 42 U.S.C. § 2000e-5(f)(1). He did not do so until January 10, 2025. (ECF 1.) Weinhaus attached to his complaint a second right to sue notice with a date of October 15, 2024, and The Regents expects Weinhaus to argue that this second notice should set the deadline for him to file suit, making his complaint timely. However, Ninth Circuit precedent holds that the EEOC does not have statutory authority to issue two right-to-sue notices, making the second notice void. Specifically, the "issuance of the EEOC of a second right to sue letter is . . . without effect," and therefore the limitations "period must be deemed to run from the issuance of the first letter." *Cleveland v. Douglas Aircraft Co.*, 509 F.2d 1027, 1030 (9th Cir. 1975), *overruled on other grounds by Valenzuela v. Kraft, Inc.*, 801 F.2d

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

1170 (9th Cir. 1986).  To accept a second EEOC letter as proper "would vitiate the congressionally mandated period of limitation in favor of a hodgepodge of ad hoc determinations by the EEOC."  *Id.*  The Central District has adopted this position, finding that the 90-day time limit to sue following the right to sue notice justifies strict adherence to the date of first issuance, particularly where neither party had an explanation for the separately dated letters.  *Jennings v. Victor Valley Cmty. Coll. Dist.*, 2016 WL 2586113, at *5 (C.D. Cal. May 2, 2016).  Weinhaus testified that he does not know why a second notice was issued.  (SUF at 89.)  Therefore, the first notice is controlling, and for this reason alone, Weinhaus' Title VII claims fail.

**2.    Both the Title VII and FEHA Claims Fail on The Merits**

**a.    Weinhaus Cannot Establish a *Prima Facie* Case of Discrimination**

Even if Weinhaus' Title VII claims were timely, they would still fail on the merits, as do his FEHA claims.  To establish a *prima facie* case of discrimination[3] under either Title VII or the FEHA, Weinhaus must show: (1) he was performing competently in his position, (2) he suffered an adverse employment action, and (3) similarly-situated employees were treated more favorably or some other circumstance suggesting discriminatory motive.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Guz v. Bechtel Nat'l, Inc.*, 24 Cal.4th 317, 354–355 (2000) (applying *McDonnell Douglas* to FEHA discrimination claims).

First, Weinhaus was not performing competently in his position.  Weinhaus was deemed by a majority of the faculty in the Department to not be teaching at the

---

[3] Weinhaus brings claims for both religious discrimination and national origin discrimination.  (FAC.)  At deposition, Weinhaus explained that he sees these claims as intertwined because of his Jewish identity, which includes both a religious and Israeli national origin component.  (SUF at 98.)  Accordingly, The Regents analyzes the religious and national origin claims together.

14

excellence level required by UCLA Anderson.[4]  Numerous students submitted negative feedback about Weinhaus, including that he was offensive, unprofessional, disrespectful, and that he discouraged students from seeking help during class by responding to questions with snarky comebacks and shame.  (SUF at 25–34, 38, 40.)  Weinhaus' colleagues also noted a lack of rigor in his courses, expressing concern that Weinhaus' courses required "between average or below average levels of work."  (SUF at 41.)  While he received high numerical scores in his student reviews, Weinhaus admits he told students he would give them the highest possible grades the university would allow and that he did not care if they did their homework.  (SUF at 6.)

Second, even if Weinhaus could show he was performing competently, he cannot show that he was denied appointment to a Continuing Lecturer position because of his Jewish identity.  To support his claim, Weinhaus only points to comments made by one student reviewer, who explained that Weinhaus referred to himself as "the hardest drinking Jew in Chicago," and that Weinhaus taught lessons through Old Testament examples.  (SUF at 38.)  Weinhaus cannot identify any other negative conduct or comments by anyone at UCLA about his Jewish identity.  (SUF at 90 ["Q. Is there anything else that UCLA -- anyone at UCLA said or did that you consider to be derogatory based on your religion other than relying on the statements from that student? A. I think the way they handled the entire review process as -- based on that, yes. Q. Okay. Anything else? A. If it's not in the complaint, then no."].)  Moreover, Weinhaus admits that he did call himself "the

_____

[4] Whether Weinhaus was performing competently is a question of academic judgment.  *See, e.g.*, *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) (when reviewing genuinely academic decisions, "judges . . . should show great respect for the faculty's professional judgment."); *Faro v. N.Y. Univ.*, 502 F.2d 1229, 1231–32 (2d Cir. 1974) ("Of all fields, which the federal courts should hesitate to invade and take over, education and faculty appointments at a University level are probably the least suited for federal court supervision.")

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

hardest drinking Jew in Chicago." (SUF at 39.) The student merely repeated Weinhaus' self-description to provide an example of the "sheer ridiculous nature" of Weinhaus' class. (SUF at 38.) This is not evidence of discriminatory animus. For example, in *Hittle v. City of Stockton*, a supervisor received an anonymous complaint that an employee was forming a "Christian coalition" at work and treating members of the "coalition" more favorably. 101 F.4th 1000, 1005 (9th Cir. 2024). The supervisor told the employee about the "Christian coalition" comment and that "he should not be involved in that," which the employee considered direct evidence of religious discrimination. *Id.* The court held that the supervisor's comments did not constitute discriminatory animus, explaining that the supervisor's "repetition of other persons' use of pejorative terms does not provide evidence of [the supervisor's] own animus, but rather shows concerns about other persons' perceptions." *Id.* at 1013–14. Here, the evidence of discriminatory animus is even weaker—the student was repeating Weinhaus' *own description of his identity*.

Weinhaus does not—and cannot—point to any other circumstance that could demonstrate discriminatory motive. He does not identify any non-Jewish comparators who were treated more favorably than him. (SUF at 91.) In addition, Weinhaus identified himself as Jewish on his application to UCLA. (SUF at 92.) If UCLA truly had discriminatory animus toward Weinhaus for his Jewish identity, it does not make sense that UCLA would hire Weinhaus in 2016, knowing he was Jewish, and continue to reappoint him for several years, then in 2022 suddenly decide not to promote him to Continuing Lecturer because of his identity. Thus, Weinhaus cannot establish a *prima facie* case of discrimination under FEHA or Title VII.

b.    **UCLA Had a Legitimate Non-Discriminatory Reason for Not Appointing Weinhaus to a Continuing Lecturer Position**

Even if Weinhaus could establish a *prima facie* case, UCLA can show that it had a legitimate, non-discriminatory reason for not appointing Weinhaus to

16

Continuing Lecturer.  As explained above, according to his colleagues and students, Weinhaus was offensive, unprofessional, disrespectful in class, and his courses were not rigorous enough.  Weinhaus simply did not meet the "high standard of excellence" required for an appointment to Continuing Lecturer at UCLA Anderson.  (SUF at 61.)  Weinhaus may believe UCLA made a mistake in not promoting "the best undergraduate faculty member they had in entrepreneurship" to Continuing Lecturer, but that does not mean that UCLA's decision was discriminatory.  *See Doyle v. CT Corp. Sys.*, 2012 WL 161355, at *6, n. 6 (N.D. Cal. Jan. 18, 2012) (quoting *Horn v. Cushman & Wakefield W., Inc.*, 72 Cal.App.4th 798, 807 (1999)) ("An employer's true reasons can be 'wrong, mistaken, or unwise'—just not discriminatory.")

Accordingly, the Court should grant summary judgment as to Weinhaus' discrimination claims.

**B.      Weinhaus' Contract Claims Fail**

**1.      Weinhaus' Failed to Exhaust his Contractual Remedies**

Under California law, a party must exhaust any contractual remedies provided by a collective bargaining agreement before filing suit.  *Serv. Emps. Int'l. Union, Loc. 1000 v. Dep't of Personnel Admin.*, 142 Cal.App.4th 866, 869–870 (2006); *Farahani v. San Diego Cmty. Coll. Dist.*, 175 Cal.App.4th 1486, 1496 (2009).  Here, Weinhaus' CBA provides the sole mechanism to resolve Weinhaus' contract claims.  As a union-represented employee, any challenge to Weinhaus' employment terms, including those related to his Excellence Review, are exclusively governed by the grievance and arbitration procedures contained in the CBA.  *Johnson v. Hydraulic Rsch. & Mfg. Co.*, 70 Cal.App.3d 675, 679 (1977) ("It is well established that a party to a collective bargaining contract which provides grievance and arbitration machinery for the settlement of disputes within the scope of such contract must exhaust the internal remedies before resorting to the courts in the absence of facts excusing such exhaustion").  The CBA provides a detailed grievance procedure for

Unit 18 faculty who allege violations of the CBA. (SUF at 93.) The CBA further provides that "[o]nly the Union may make an appeal to arbitration and only after the timely exhaustion of the Grievance Procedure of this Agreement." (SUF at 83.) This process is binding and a prerequisite to seeking a remedy from the Court.

Here, Weinhaus did not exhaust his contractual remedies under the CBA. First, it is undisputed that Weinhaus' grievance was untimely. (SUF at 70, 78).

Second, even if Weinhaus' grievance had been timely, Weinhaus did not pursue his grievance to a final decision on the merits by appealing the Step 3 decision to arbitration. (SUF at 84.) Thus, Weinhaus failed to exhaust his contractual remedies available under the CBA, and his state law contract claims are barred as a matter of law.

### 2. Weinhaus' Breach of Oral Contract Claim Fails

To prevail on a cause of action for breach of contract, Weinhaus must prove: (1) there was a valid contract, (2) he performed its obligations under the contract, (3) The Regents breached the contract, and (4) he was harmed by the breach. *Richman v. Hartley*, 224 Cal.App.4th 1182, 1186 (2014). Weinhaus' breach of contract claim fails because he cannot establish the existence of a valid contract.

### a. Weinhaus' Alleged Employment Outside the CBA Was Governed by Statute, not Contract

The Regents is the public entity that governs the University of California system, which in turn is created under Article IX, section 9 of the California Constitution. Cal. Const. art. IX, § 9; *De Vries v. Regents of Univ. of Cal.*, 6 Cal.App.5th 574, 583–84 (2016); Cal. Gov't Code § 811.2 ("'Public entity' includes . . . the Regents of the University of California . . .").

The California Government Code expressly provides that public employment can be governed by collective bargaining agreements, but not private agreements. Cal. Gov't Code §§ 3505, 3505.1; *Retired Emps. Ass'n of Orange Cnty. v. County of Orange*, 52 Cal.4th 1171, 1188 (2011); *Grasko v. L.A. City Bd. of Educ.*, 31

18

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

Cal.App.3d 290, 303–04 (1973). Courts, therefore, may dismiss a public employee's breach of contract claims, and any claims based on the existence of an individual employment contract.

For example, in *Hill v. City of Long Beach*, a city employee filed breach of contract claims associated with his removal from his position with the city. 33 Cal.App.4th 1684, 1689 (1995). The court ordered judgment be entered for the city after finding that the city employee "was not entitled to contract remedies against the City for his removal from the position of managing director. His remedies, if any, were confined to those provided by statute or ordinance." *Id*. at 1690, 1696.

Here, Weinhaus' employment was governed by the CBA. However, to the extent Weinhaus contends he had a contract outside the CBA, it is governed by statute, and like in *Hill*, "[h]is remedies, if any, [are] confined to those provided by statute or ordinance." *Hill*, 33 Cal.App.4th at 1690.

**b.    Interim Dean Osborne and Director Wilson Did Not Have Authority to Enter Into a Contract on Behalf of The Regents**

Weinhaus' contract-based claims also fail because "no contractual obligation may be enforced against a public agency unless it appears the agency was authorized by the Constitution or statute to incur the obligation; a contract entered into by a governmental entity without the requisite constitutional or statutory authority is void and unenforceable." *White v. Davis*, 30 Cal.4th 528, 549 (2003) (internal citations omitted); see also *G.L. Mezzetta, Inc. v. City of American Canyon* 78 Cal.App.4th 1087, 1092 (2000) ("A contract entered into by a local government without legal authority is 'wholly void,' ultra vires, and unenforceable." (internal citations omitted)). People working with a public agency are "presumed to know the law with respect to any agency's authority to contract." *Katsura v. City of San Buenaventura*, 155 Cal.App.4th 104, 109 (2007) ("One who deals with the public officer stands presumptively charged with a full knowledge of that officer's powers,

19

and is bound at his … peril to ascertain the extent of his … powers to bind the government for which he … is an officer." (internal citations omitted)).

Neither Interim Dean Osborne nor Director Wilson had (or has) the authority to enter into a contract, on behalf of the Regents, with Weinhaus.  In *Katsura v. City of San Buenaventura*, the court determined a contractor could not recover on an oral contract made by the associate city engineer or project manager, as there was no statutory provision "for execution of oral contracts by employees of the City who do not have requisite authority." *Id*.  As such, the "alleged oral statements by the [city employees were] insufficient to bind the City." *Id*.  Here, neither Interim Dean Osborne nor Director Wilson had the authority to enter into a contract on behalf of The Regents.  (SUF at 94, 95.)  Weinhaus testified that he was "confused" about who had the authority to assign him courses each year.  (SUF at 96.)  Under California law, Weinhaus was presumed to know who had authority to enter into a contract on behalf of The Regents, and he cannot offer any evidence, including any constitutional or statutory provision, to support that Interim Dean Osborne or Director Wilson had that authority.  *Katsura*, 155 Cal.App.4th at 109.  Thus, any alleged contract outside of the CBA is unenforceable.  *White*, 30 Cal.4th at 549.

### c.      Parol Evidence Rule Bars Alleged Contracts

The parol evidence rule provides that "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement."  Cal. Civ. Proc. Code § 1856(a).  The parol evidence rule "is a rule of substantive law making the integrated written agreement of the parties their exclusive and binding contract *no matter how persuasive the evidence* of additional oral understandings.  Such evidence is legally irrelevant and cannot support a judgment." *Marani v. Jackson*, 183 Cal.App.3d 695, 701 (1986).

Here, the parties intended for the CBA to be fully integrated.  The CBA provides:

20

> The University and the Union acknowledge that during the negotiations which resulted in this Agreement, each had the right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and the understandings and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this Agreement and **that this Agreement constitutes the agreement arrived at by the parties**.

(SUF at 97 (emphasis added).)  In addition, Weinhaus' alleged oral contracts directly contradict the terms of the CBA, which provides specific process for how employment contracts are entered for Unit 18 faculty.  "There cannot be a valid express contract [the CBA,] and an implied contract [alleged oral contracts], each embracing the same subject, but requiring different results." *Slivinsky v. Watkins-Johnson Co.*, 221 Cal.App.3d 799, 806 (1990).  Accordingly, the CBA represents the final expression of the parties' agreement, and Weinhaus' alleged prior or contemporaneous oral contracts are barred by the parol evidence rule.

### d.    Statute of Frauds Renders Alleged Contracts Unenforceable

Any "agreement that by its terms is not to be performed within a year from the making thereof" is invalid unless "in writing and subscribed by the party to be charged."  Cal. Civ. Code § 1624(a)(1).  It is undisputed that the MGMT 169 Contract and January 2023 Contract were both oral.  (SUF at 65, 67.)  It is also undisputed that the alleged contracts contemplated performance extending well-beyond one year from formation; the alleged MGMT 169 Contract provided that Weinhaus could teach MGMT 169 as long as it was being offered, and the alleged January 2023 contract provided that the MGMT 169 Contract would be upheld and that Weinhaus' employment included promised future courses into academic year 2023-24 and forward.  (SUF at 66, 68.)  Therefore, the alleged oral contracts are invalid under California law.

Thus, for all the foregoing reasons, the alleged MGMT 169 Contract and January 2023 Contract are invalid or unenforceable, and Weinhaus cannot, as a matter of law, establish a claim for breach of contract.

### 3.    Weinhaus' Unjust Enrichment Claim Fails

As a threshold matter, The Regents is immune from common law claims, including unjust enrichment.  Cal. Gov't Code §§ 815(a), 818.8; *Colome v. State Athletic Comm'n of Cal.*, 47 Cal.App.4th 1444, 1454–55 (1996).

Even if Weinhaus could bring common law claims against The Regents, "[i]t is settled that 'a private party cannot sue a public entity on an implied-in-law or quasi-contract theory, because such a theory is based on quantum meruit or restitution considerations which are outweighed by the need to protect and limit a public entity's contractual obligations.'"  *Katsura*, 155 Cal.App.4th at 109–10 (quoting *Janis v. Cal. State Lottery Com.*, 68 Cal.App.4th 824, 830 (1998)).

Multiple state and federal courts have reviewed this question and unanimously concluded, a "plaintiff cannot sustain a claim against UC Regents for unjust enrichment."  *Doe v. Regents of Univ. of Cal.*, 672 F.Supp.3d 813, 822 (N.D. Cal. 2023) (sustaining motion to dismiss unjust enrichment claim against The Regents based on implied contract).  This is particularly true if the contract is an oral one.  *See Pasadena Live v. City of Pasadena*, 114 Cal.App.4th 1089, 1094 (2004) (dismissing claim for unjust enrichment based on an oral contract and stating "[a] public entity cannot be held liable on an implied-in-law or quasi contract theory.").

Weinhaus' unjust enrichment claim against The Regents is precluded under settled law and is subject to summary judgment.

### 4.    Weinhaus' Promissory Estoppel Claim Fails

To the extent Weinhaus sets forth a claim for promissory estoppel, to support his claim, he must show: (1) a promise clear and unambiguous in its terms; (2) reliance on that promise; (3) his reliance was both reasonable and foreseeable; and (4) he was injured by the reliance.  *Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 792 (9th Cir. 2012); *see also Granadino v. Wells Fargo Bank, N.A.*, 236 Cal.App.4th 411, 416 (2015).  Here, Weinhaus cannot identify any "clear and unambiguous" promise for employment.  When asked about the alleged January

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

2023 Contract, Weinhaus testified, "Well, I don't remember the exact words that [Wilson] would have used." (SUF at 67.) He could only describe the contract in vague terms: "So, yeah it was more like hey you can teach this or we're going to move you to this class in here, this should be fine, let's do it, you'll do it." (*Id.*) Moreover, Weinhaus cannot show he reasonably relied on the alleged promises. As explained above, neither Interim Dean Osborne nor Director Wilson had the authority to enter into a contract on behalf of The Regents, which Weinhaus was presumed to know under state law. Thus, it was not reasonable for Weinhaus to rely on any alleged promise by Osborne or Wilson.

Additionally, promissory estoppel claims can be brought against a public agency "only in those special cases where the interests of justice clearly require it." *Ponte v. County of Calaveras*, 14 Cal.App.5th 551, 557 (2017). Promissory estoppel cannot be asserted against a public entity to bypass rules that require contracts to be in writing. *Id.* at 556; *see also Poway Royal Mobilehome Owners Ass'n v. City of Poway*, 149 Cal.App.4th 1460, 1476 (2007) (rejecting oral contract; "Numerous cases hold promissory estoppel may not be raised against a public entity when it would defeat the public policy of requiring adherence to statutory procedures for entering into contracts.").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT

**V.   CONCLUSION**

For all the foregoing reasons, The Regents respectfully requests the Court grant its motion for summary judgment.  In the alternative, the Court should grant partial summary judgment in favor of The Regents.

Dated:  May 4, 2026                    QUARLES & BRADY LLP


By:  /s/ Sandra L. McDonough
      SANDRA L. McDONOUGH
      MATTHEW W. BURRIS
      LUCY J. PERITZ
      Attorneys for THE REGENTS OF THE
      UNIVERSITY OF CALIFORNIA

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT